**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ronald William PELTON,
Defendant–Appellant.**

No. 86–5182.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 8, 1987.

Decided Dec. 18, 1987.

---

Stephen Jon Cribari, Deputy Federal Public Defender (Fred Warren Bennett, Federal Public Defender, Baltimore, Md., on brief), for defendant-appellant.

Robert Neal McDonald, Asst. U.S. Atty. (Breckenridge L. Willcox, U.S. Atty., Baltimore, Md., Juan Marrero, Trial Atty., Dept. of Justice, Mary C. Lawton, Counsel for Office of Intelligence Policy and Review, Washington, D.C., and Sally Balch Hurme, Atty. Advisor, Office of Intelligence Policy and Review, Arlington, Va., on brief), for plaintiff-appellee.

Before RUSSELL, PHILLIPS, and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

Ronald William Pelton challenges his convictions of conspiracy to commit espionage, 18 U.S.C. § 794(c), espionage and attempted espionage, 18 U.S.C. § 794(a), and unauthorized disclosure of classified information concerning communications intelligence, 18 U.S.C. § 798(a), for which he was sentenced to three life terms plus ten years imprisonment.

Pelton contends that incriminating statements he made to the FBI should have been excluded as involuntary, that there was insufficient evidence to support his attempt conviction, and that the district court erred in admitting evidence obtained under the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §§ 1801–1811. We reject these challenges, and affirm Pelton's convictions.

## I.

Pelton was born in 1941. He holds a high school diploma, and has completed a one-year Russian language course. He served in the United States Air Force from 1960 to 1964. Thereafter, he was employed by the National Security Agency (NSA) from 1965 to 1979. Pelton worked in the area of communications intelligence and cryptology with highly classified information concerning the interception and interpretation of Soviet transmissions. His colleagues testified that he was aggressive and a good negotiator. Pelton left the NSA in 1979 after financial problems and bankruptcy, and has subsequently held a variety of jobs.

In January, 1980, Pelton decided to sell classified information about NSA programs to the Soviet Union. In a series of telephone calls, Pelton contacted Soviet officials and arranged a meeting for this purpose. These calls were intercepted by a wiretap placed under the provisions of FISA, but Pelton's voice was not identified at that time. From 1980 through 1983 Pelton met with Soviet agents in their Washington embassy and in Vienna, Austria, and provided them with information that compromised several classified NSA

operations. Pelton generally conveyed the information by responding to questions from his Soviet contacts. In return for the secrets, Pelton was paid more than $35,000.

An abortive 1985 effort at further dealings with the Soviets was the basis for Pelton's attempt conviction. Soviet agents contacted Pelton, and he arranged to travel to Vienna, borrowing a friend's credit card to cover expenses. Pelton remained in Vienna for several days, attempting to make contact with the Soviets. He spent most of three days walking in the park that was the designated meeting place, but was never approached—possibly because Pelton had lost 75 pounds since his last meeting with his Soviet contacts. Pelton then gave up and flew home. A final trip to Vienna failed to materialize when Pelton ran out of gas on the way to pick up his instructions and expense money.

Pelton's activities were discovered when a Soviet defector exposed him and NSA officials recognized Pelton's voice on the 1980 FISA tapes. During the resulting investigation, the FBI undertook electronic surveillance of Pelton pursuant to a FISA authorization. Pelton was then arrested after making incriminating statements in an interview with FBI agents. Because the Soviet defector who knew of Pelton's espionage had redefected, these admissions were crucial to proving the government's case at trial. Pelton's challenge to the voluntariness of these statements is likewise the heart of his appeal.

Pelton made the admissions in an interview with FBI agents at the Annapolis Hilton. He agreed to meet there with the agents at 9:15 a.m. on Sunday, November 24, 1985, after they telephoned and said that they were investigating a national security matter. The agents had previously prepared a number of rooms to serve as an interrogation site. They were dressed casually and were not armed.

In the room, the agents recounted to Pelton a "hypothetical" story about a former NSA official who sold secrets to the Soviets. The details of the story, including places, dates, and all names but Pelton's, reflected precisely Pelton's own activity.

At the end of the presentation, Pelton denied that he was the individual in the story and stated "you have no case." He also said that the hypothetical individual would be "crazy" not to talk to a lawyer before making any statement that would "hang him." The agents told Pelton that his denials were pointless—the FBI had identified his voice through voiceprint analysis. They further told Pelton that he had the right to consult an attorney, but that if an outsider became involved in the discussions their "options would be reduced." They also stated that any attorney would need the proper security clearance to be involved in discussions of national security material. The agents finally told Pelton that they were prepared to conduct an open investigation, including interviews of Pelton's family and friends, if Pelton did not cooperate.

At this point, Pelton and the agents began a series of exchanges in which Pelton stated that he wanted "guarantees" before making any further statements. The agents repeatedly stated that they did not have the authority to make guarantees, but that national security cases often are not prosecuted, and that they would report Pelton's cooperation to their superiors and testify as to his cooperation in any future prosecution. In response to Pelton's observation that John Walker had cooperated but nonetheless gotten a life sentence, the agents stated that they viewed his case very differently from Walker's. The agents continued, however, to emphasize that they could give no guarantees.

During the course of questioning, Pelton began to answer the agents' questions in detail, revealing the payments, contact procedures, and meetings that he had arranged with the Soviets. Pelton told them that he was scheduled to contact the Soviets soon, and asked if he should make the contact. The agents told him not to make the contact, and that they could not authorize him to do so. Pelton told the agents to "stop the disclaimers."

The agents told Pelton again that if he cooperated, there would be no overt investigation, but that they could not control in-

vestigation of any other criminal activity in which Pelton might be involved. At this point Pelton discussed his tax and drug abuse problems with the agents. Pelton continued to tell the agents about his contacts with the Soviets, but consistently refused to tell the agents the details of the classified information that he gave the Soviets without "guarantees." Pelton interrupted the interview twice to telephone his girlfriend, Ann Barry, and finally left at 1:30 p.m. to meet Barry for a brunch date after agreeing to continue discussions with the agents the following day.

The FBI, under a FISA court order, monitored Pelton's telephone calls and conversations during the approximately nine hours that he spent with Barry. During this time, Pelton cooked himself an omelet, and joined Barry in a trip to 11th and 0 Streets, N.W., in Washington, D.C., to purchase illegally the drug "dilaudid," an opiate. In the monitored conversations, Pelton stated that he was trying to make a deal with the government, and that it was possible that he would be prosecuted and spend twenty years in jail. During his visit with Barry, Pelton consumed several alcoholic beverages. He and Barry also "cooked up" and intravenously took the dilaudid.

The agents contacted Pelton again that night at 9:45 p.m. and asked that he resume the interview. He agreed, and met them at the Hilton for more questioning shortly before 11:00 p.m. During this questioning, the agents stated that their superiors needed more information. They stated that the Soviet defector had already revealed that Pelton had compromised materials designated as "Project A," so Pelton could give them details of this project without violating his concern about guarantees. Pelton then discussed the details of Project A, and acknowledged that his actions had harmed the United States. Pelton refused to answer further questions on another matter without guarantees, and was again told that if he ceased to cooperate, a full scale investigation would follow.

At this point, the agents presented Pelton with an advice of rights and warning form. The form clearly stated that Pelton had a right to remain silent, that anything he said could be used against him in court, and that he had the right to a lawyer. The form included the following just above Pelton's signature: "I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

Pelton read and signed the form. He then continued to answer questions about how he came to sell information to the Soviets and he acknowledged that he had harmed the United States. Pelton continued to refuse to give detailed information about what he had sold without guarantees, and told the agents that they could make no case because they could not get either documents or the defector back from the Soviets. After this, the agents arrested Pelton at the instruction of their superiors, and no further questioning ensued.

## II.

Pelton argues that his incriminating statements were not voluntary, and that his conviction based on those admissions must be reversed. He contends that he made his statements to the agents because they led him to believe that he would not be prosecuted, but would be employed in a counterintelligence operation. He further argues that the statements were a result of his being misled, threatened, and under the influence of drugs and alcohol.

The voluntariness of a statement is to be determined from the "totality of the circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir.1980). The test of voluntariness is whether the defendant's will has been "overborne" or his "capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854

(1973). Voluntariness is not, however, "to be equated with the absolute absence of intimidation," for under this test virtually no statement would be voluntary. *Wertz,* 625 F.2d at 1134.

An appellate court must make an independent determination on the issue of voluntariness. *E.g., Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976); *United States v. Locklear,* 829 F.2d 1314 (4th Cir.1987). Although the review of this ultimate issue is to be independent, the district court's findings of fact on the circumstances surrounding the confession are to be accepted unless clearly erroneous. *Locklear, supra; see also Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985). Applying these standards, we do not hesitate to find that Pelton's statements were voluntary. Pelton makes several specific allegations, however, and we will address them individually.

First, Pelton emphasizes that the agents did not advise him of his *Miranda* rights prior to questioning. The district court found that this fact did not require suppression of the confession because Pelton was not "in custody" when questioned. Pelton does not appeal this finding. Nonetheless, Pelton correctly states that the absence of *Miranda* warnings is one "factor" to be considered in assessing the voluntariness of a confession. *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed. 2d 895 (1966); *Thomas v. North Carolina,* 447 F.2d 1320 (4th Cir.1971).

The facts of this case do not suggest that Pelton would not have made the incriminating statements had he been given *Miranda* warnings at an earlier time. Pelton continued to give incriminating evidence to the agents *after* receiving warnings during the evening session. Further, the cases cited by Pelton in support of this argument involved interrogations far different from this one. *Thomas,* for example, concerned the interrogation of a fifteen-year-old elementary school dropout with an IQ of 72 who was held incommunicado for nineteen hours and not brought before a magistrate for two days. The fact

that an absence of *Miranda* warnings was used as a factor in invalidating such a confession bears little relevance to these very different facts.

Pelton next argues that his statement that the hypothetical man in the story would be "crazy" not to talk to a lawyer was a request for counsel, that the agent's response to the request was misleading, and that his statements were therefore involuntary. The agents advised Pelton that he had a right to counsel, but that their options would be reduced if an outsider were brought into the discussion and that they would not be able to continue sensitive discussions with a lawyer who had no security clearance. Pelton argues that he inferred from these statements that he could not have the advice of an attorney during the interview.

It is doubtful that Pelton's oblique remarks on the agents' "hypothetical" story constituted a request for counsel. Moreover, there is no indication that the agent's statements about counsel were false. We have stated that "a law enforcement officer may properly tell the truth to the accused." *United States v. Williams,* 479 F.2d 1138, 1140 (4th Cir.1973). The agents *did* inform Pelton that he had a right to counsel, and there has been no assertion that the agents would, in fact, have discussed national security information with a lawyer who had no security clearance. The implication, which is a perfectly permissible one, is that in the presence of an attorney the discussions might have to cease. The further fact that Pelton continued to make statements after signing the advice of rights form belies his claim that more insistent warnings concerning his right to counsel would have altered his behavior. We cannot accept anything in this sequence of events as a basis for a finding of involuntariness.

Pelton next claims that the agents' assertion that the FBI would conduct a full scale investigation if he did not cooperate were intimidating. We reject this claim. Pelton does not dispute that the agents were telling him the truth about the future

course that an investigation could legally and properly take. This course might have been uncomfortable for Pelton, but it is hardly coercive, and seems mild in comparison to statements in the cases on which Pelton relies. *Cf. United States v. Tingle,* 658 F.2d 1332 (9th Cir.1981) (woman told that if she did not cooperate she would not see her children again for a very long time); *Ferguson v. Boyd,* 566 F.2d 873 (4th Cir.1977) (confession obtained from defendant in return for the release of his girlfriend, who had been improperly held without bond away from her young children for a week). Truthful statements about Pelton's predicament are not the type of "coercion" that threatens to render a statement involuntary. As the Supreme Court has observed, no statements would qualify as voluntary under such a standard, for "very few people give incriminating statements in the absence of official action of some kind." *Schneckloth,* 412 U.S. at 224, 93 S.Ct. at 2046.

■ Pelton next argues that his admissions were involuntary because they were the result of promises of leniency. He points to the agents' statements that many national security cases do not end in prosecutions, that the agents would testify that Pelton had cooperated, that if he cooperated there would be no overt investigation, and that the agents viewed Pelton's case very differently from that of convicted spy John Walker. Pelton now argues that he took these statements to mean that he would not be prosecuted but would be used as a double agent, or that if he were prosecuted, he would be treated leniently.

■ Even when examined from Pelton's point of view, *see Grades v. Boles,* 398 F.2d 409 (4th Cir.1968), we are not persuaded that the agents' statements could have led to involuntary admissions here. Agents may properly initiate discussions on cooperation, and may indicate that they will make this cooperation known. *See United States v. Shears,* 762 F.2d 397, 401–02 (4th Cir.1985). General encouragement to cooperate is far different from specific promises of leniency.

Further, we cannot credit Pelton's claim that he believed the agents promised leniency and assignment as a double agent. Far from promising him assignment as a double agent, the FBI told him not to recontact the Soviets. The record is clear— and Pelton acknowledges—that the agents consistently refused to give any guarantees. Pelton in return refused to give certain information to the agents, apparently in the erroneous belief that only that information could harm him. Finally, Pelton signed the advice of rights form stating that "No promises or threats have been made to me." It is difficult to believe that Pelton signed this form despite a belief that he had been promised leniency, immunity, and assignment as a double agent. The totality of these facts do not support a finding that Pelton's will was overborne through broken promises. It is more likely that he aspired to negotiate a deal to become a double agent, and now wishes to recharacterize events because of his disappointment that the deal did not materialize.

■ Pelton finally argues that the setting of the interview and his own personal characteristics support a holding of involuntariness. We find these assertions meritless. The interviews were conducted by unarmed agents in a public hotel, not in a "police office or in a hostile or unusual environment." *Wertz,* 625 F.2d at 1134. Pelton was allowed to use the telephone, move freely about the questioning room, and leave unaccompanied for a brunch date. The setting of the interview supports our holding that the statements were voluntary.

Pelton's personal characteristics likewise do not support his claim. The record shows that Pelton was an educated man who felt well able to protect his own interests. Pelton did consume some alcohol and narcotics between the sessions. There was expert testimony at the suppression hearing, however, that the effects of these substances would have dissipated prior to the evening interview. Pelton's behavior at that interview did not suggest impairment. None of Pelton's personal characteristics

provides support for a finding that his will was overborne.

In sum, the agents acted well within the bounds of constitutional propriety. After "careful scrutiny of all the surrounding circumstances," *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047, we find that Pelton has not shown that his will was overborne or his capacity for self-determination critically impaired. Pelton appears to have made a calculated decision in talking and attempting to bargain with the agents. He now realizes that his expectations did not pan out. The fact that a gamble has been made and lost does not render the resulting statements involuntary. The type of standard for which Pelton argues would require *Miranda* warnings before the initiation of any interview, and repeated warnings that it might not be in subject's best interest to cooperate. This is not the standard required by a "voluntariness" review. Pelton could and did, as permitted by 18 U.S.C. § 3501, argue before the jury that his statements were involuntary, but the trial judge was correct in denying Pelton's suppression motion.

### III.

■■■ Pelton next argues that there was insufficient evidence to support his conviction of attempted espionage in violation of 18 U.S.C. 794(a). Here, the evidence must show (a) culpable intent, and (b) a substantial step toward the commission of the crime that is strongly corroborative of that intent. *See e.g., United States v. McFadden,* 739 F.2d 149, 152 (4th Cir.1984); *United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir.1974). Viewing the evidence in the light most favorable to the government, there is substantial evidence to support Pelton's conviction on this count. *See Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

■■■ Pelton argues that there could be no culpable intent because he did not know what information the Soviets wanted. This ignores Pelton's entire mode of operation. Pelton's past acts of espionage had not involved the simple transmission of documents. Rather, Pelton contacted the Soviets and allowed them to ask him questions on matters that were of interest to them. The fact that Pelton spent days trying to contact the Soviets demonstrates that he did have the intent to convey national security information to them. His claim that he believed that he had already told the Soviets everything that could be of use to them does not negate this evidence of intent. Had the Soviets thought of other questions that they wished to ask, the evidence indicates that Pelton was more than anxious to answer.

Pelton also took the requisite "substantial step" by travelling to Austria and walking in the meeting area for three days. His repeated attempts to make contact with the Soviets strongly corroborate his intent to pass information to them. Pelton in fact took every possible step to contact the Soviets, and was prevented from committing the crime only by fortuity. If leaving a room with concealed documents constitutes a "substantial step" toward transmitting them to a foreign agent, so does Pelton's trip to Austria. *See United States v. Forbrich,* 758 F.2d 555 (11th Cir.1985).

### IV.

Pelton's final challenge is to the introduction of the evidence gathered under the Foreign Intelligence Surveillance Act. First, Pelton contends that the FISA statute itself is unconstitutional. Second, Pelton claims that the 1985 surveillance directed at him was not conducted for "foreign intelligence purposes" as required by the statute. We cannot accept either of these arguments.

■■■ FISA was passed by Congress in 1978 to create a "secure framework by which the Executive Branch may conduct legitimate electronic surveillance for foreign intelligence purposes within the context of this Nation's commitment to privacy and individual rights." S.Rep. No. 604, 95th Cong., 1st Sess. 15, *reprinted* in 1978 U.S.Code Cong. & Ad.News 3904, 3916. FISA provides the process by which the government may obtain authorization for electronic surveillance of a "foreign pow-

er" or an "agent of a foreign power" as defined in 50 U.S.C. § 1801. Court-ordered FISA surveillance, such as that involved in this case, requires first that a federal officer submit an application containing, *inter alia,* a statement of reasons to believe that the target of the surveillance is a foreign power or agent of a foreign power, specified information on the implementation of the surveillance, and a "certification" from a high-ranking executive branch official stating that the official "deems the information sought to be foreign intelligence information" and that the information sought cannot be obtained by other means. 50 U.S.C. § 1804.

Applications are reviewed by members of a "FISA Court," comprised of federal judges designated by the Chief Justice. *Id.* § 1803. A surveillance order will issue if the reviewing judge finds certain conditions to be met, including probable cause to believe that the target of the surveillance is a foreign power or agent of a foreign power, that proposed "minimization procedures" are sufficient under the terms of the statute, that the certifications required by § 1804 have been made, and, in the case of a "United States person" such as Pelton, that the certifications are not "clearly erroneous." *Id.* § 1805. Information gathered pursuant to FISA authorization may be used in a criminal prosecution with the authorization of the Attorney General. *Id.* § 1806.

Pelton asserts that allowing electronic surveillance on anything less than the traditional probable cause standard for the issuance of a search warrant violates the Fourth Amendment. He contends that the need for foreign intelligence does not justify any exception to the warrant requirement. We disagree. Although the Supreme Court has yet to address this issue, it has suggested that a more flexible standard may be appropriate in the context of foreign intelligence and that the warrant requirement "may vary according to the governmental interest to be enforced and the nature of citizen rights deserving protection." *United States v. United States District Court,* 407 U.S. 297, 322–23, 92 S.Ct. 2125, 2139, 32 L.Ed.2d 752 (1972). Prior to the enactment of FISA, this court

joined all save one of the circuits to have addressed the question in holding that the President has the inherent power to conduct warrantless electronic surveillance for foreign intelligence purposes. *United States v. Truong,* 629 F.2d 908, 912–14 (4th Cir.1980).

We now join the other courts of appeal that have reviewed FISA and held that the statute meets constitutional requirements. *See United States v. Cavanagh,* 807 F.2d 787 (9th Cir.1987); *United States v. Duggan,* 743 F.2d 59 (2d Cir.1984). FISA's numerous safeguards provide sufficient protection for the rights guaranteed by the Fourth Amendment within the context of foreign intelligence activities. The governmental interests in gathering foreign intelligence are of paramount importance to national security, and may differ substantially from those presented in the normal criminal investigation. *See United States District Court,* 407 U.S. at 321–24, 92 S.Ct. at 2138–40. FISA requires judicial review prior to the initiation of the type of surveillance conducted here and sets careful limitations on its exercise. 50 U.S.C. §§ 1803–1805. The reviewing judge must find probable cause to believe that a target such as Pelton is an agent of a foreign power. *Id.* The Act also requires the use of "minimization procedures" for the protection of the targets of surveillance, *see id.* § 1801, and limits the duration of surveillance of an agent of a foreign power to no more than ninety days, *id.* § 1805. We find the provisions of FISA to be "reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens," *United States District Court,* 407 U.S. at 323, 92 S.Ct. at 2139, and therefore compatible with the Fourth Amendment.

We also reject Pelton's claim that the 1985 FISA surveillance was conducted primarily for the purpose of his criminal prosecution, and not primarily "for the purpose of obtaining foreign intelligence information" as required by 50 U.S.C. § 1802(b). Our review of the FISA materials in this case has made clear that the application contained the certifications required by § 1804, including the basis for the certifying officer's belief that the information

sought was foreign intelligence information, that there was probable cause to believe that Pelton was the agent of a foreign power, and that the certifications were not clearly erroneous.

Where, as here, the statutory application was properly made and earlier approved by a FISA judge, it carries a strong presumption of veracity and regularity in a reviewing court. *See Duggan,* 743 F.2d at 77. We agree with the district court that the "primary purpose of the surveillance, both initially and throughout, was to gather foreign intelligence information." It is clear that "otherwise valid FISA surveillance is not tainted simply because the government can anticipate that the fruits of the surveillance may later be used, as allowed by § 1806(b), as evidence in a criminal trial." *Id.* at 78. The FISA evidence in this case was obtained in accordance with the requirements of the statute, and was properly admitted by the district court.

The judgment of the district court is AFFIRMED.