### UNITED STATES

### v.

### James R. WILMOTH, 505 08 8208 Airman Recruit (E–1), U.S. Naval Reserve.

### NMCM 90 3754.

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 23 Sept. 1989.

Decided 23 Dec. 1991.

---

Maj R.T. McNeil, USMC, Appellate Defense Counsel.

ENS M.R. Hogan, JAGC, USNR, Appellate Government Counsel.

LCDR J. Richard Chema, JAGC, USNR, Appellate Government Counsel.

Before STRICKLAND, ORR and MOLLISON, JJ.

MOLLISON, Judge:

We have examined the record of trial, the assignments of error,[1] and the Government's reply thereto, and have concluded that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed.

Consistent with his pleas, the appellant was found guilty of one count of conspiracy to convey classified information to unauthorized persons, one count of failing to report a contact with a citizen of the Soviet Union, one count of attempted espionage, two counts of wrongful use of hashish and marijuana, four counts of wrongful distribution of hashish, and one count of wrongfully receiving national defense documents in violation of Articles 81, 92, 106a, 112a, 134, respectively, of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 881, 892, 906a, 912a, 934.[2] A military judge sitting alone sentenced the appellant to be confined for 35 years, to forfeit all pay and allowances, and to be discharged from the naval service with a dishonorable discharge. Pursuant to a pretrial agreement, the convening authority reduced the confinement to 15 years, but otherwise approved the sentence as adjudged. The appellant now contends that his plea of guilty to the offense of attempted espionage was improvident because the overt acts he admitted in the guilty plea providence inquiry did not amount to more than mere preparation. He also now contends that the sentence he bargained for is inappropriately severe in light of post-trial clemency matters filed by the appellant and the sentence approved in the case of the appellant's co-conspirator.

An accused may not enter inconsistent, improvident or uninformed pleas of guilty. Article 45, UCMJ, 10 U.S.C. § 845. The military judge may not accept a plea of guilty to an offense without inquiring into the factual basis for the plea. Rule for Courts–Martial (R.C.M.) 910(e), Manual for Courts–Martial (MCM), United States, 1984; *United States v. Care*, 18 U.S.C.M.A. 535, 40 C.M.R. 247 (1969). Inconsistencies and apparent defenses must be resolved or the guilty pleas must be rejected by the military judge. *United States v. Jemmings*, 1 M.J. 414 (C.M.A.1976); *United States v. Jackson*, 23 M.J. 650, 652 (N.M.C.M.R. 1986), *pet. denied*, 24 M.J. 405 (C.M.A. 1987). When the accused's responses reasonably raise the question of a defense, the military judge must make a more searching inquiry. *United States v. Timmins*, 21 U.S.C.M.A. 475, 45 C.M.R. 249, 253 (1972). Before this Court will find a providence inquiry inadequate, the record must contain some reasonable ground for finding an inconsistency between the plea and the accused's statement, and reversal will not follow from the mere possibility of a conflict. *United States v. Logan*, 22 U.S.C.M.A. 349, 351, 47 C.M.R. 1, 3 (1973); *United States v. Logan*, 31 M.J. 910, 913 (A.F.C.M.R.1990); *United States v. Tichy*, 50 C.M.R. 526, 529 (N.C.M.R.1975).

Article 106a was added to the Code in 1985.[3] It established the capital offense of peacetime espionage and was patterned after the Espionage Act. 18 U.S.C. § 794(a); H.R.Conf.Rep. No. 235, 99th Cong., 1st Sess. 424, *reprinted in* 1985 U.S.Code Cong. & Admin.News 472, 571, 577. The

---

1. I. THE PROVIDENCY INQUIRY DID NOT PROVIDE A SUFFICIENT FACTUAL BASIS TO SUSTAIN A FINDING OF GUILTY TO SPECIFICATION 2, CHARGE III (ESPIONAGE).
   II. A SENTENCE WHICH INCLUDES CONFINEMENT FOR FIFTEEN YEARS IS INAPPROPRIATELY SEVERE.

2. The offense of wrongfully receiving national defense documents is cognizable in trials by courts-martial under clause 3 of Article 134, UCMJ, 10 U.S.C. § 834, "crimes and offenses not capital." The substantive offense was a violation of 18 U.S.C. § 793(c). *See United States v. Harris*, 18 U.S.C.M.A. 596, 40 C.M.R. 308 (1969); *United States v. Perkins*, 47 C.M.R. 259 (A.C.M.R. 1973).

3. Department of Defense Authorization Act, 1986, Pub.L. No. 99–145, § 534, 99 Stat. 583, 634–35 (1985).

language of 18 U.S.C. § 794(a) was adopted "for the new Article 106a to ensure that the treatment of the substantive offense by courts-martial and military appellate courts will be guided by applicable civilian precedents, including such cases as may arise in the future in the federal system."[4] H.R.Conf.Rep. at 425, 1985 U.S.Code Cong. & Admin.News at 578.

▉ Article 106a, UCMJ, proscribes both espionage and attempted espionage. The offense of attempted espionage includes the attempt to communicate or deliver documents, writings or information relating to the national defense to an agent or citizen of a foreign government with intent or reason to believe such documents, etc., are to be used to the injury of the United States or to the advantage of a foreign nation. One of the essential elements of the offense of attempted espionage is that the act amounted to more than *mere* preparation. MCM, Part IV, ¶ 30ab(2)(c).

> Preparation consists of devising or arranging the means or measures necessary for the commission of the offense. The overt act required goes beyond preparatory steps and is a direct movement toward the commission of the offense.... The overt act need not be the last act essential to the consummation of the offense.

MCM, Part IV, ¶ 4c(2).[5]

Courts have struggled over the years to define the dividing line between preparation and attempt. *United States v. Church*, 32 M.J. 70, 72 (C.M.A.1991).

> The difference between the two may not be "wide" as a matter of fact. As one approaches the other we may find a diffi-

cult "twilight zone" rather than a sharp and clear dividing line.

> . . . .

> The preparatory-perpetrating dichotomy is useful in discussing situations of a rather general nature, but the actual dividing line between the two is shadowy in the extreme.

*Id.* at 72 (quoting R. Perkins & R. Boyce, *Criminal Law* 617, 621 (3d ed. 1982)).

One line of authority suggests that a " 'defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime' and that '[a] substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.' " *United States v. Byrd*, 24 M.J. 286, 290 (C.M.A.1987) (quoting *United States v. Jackson*, 560 F.2d 112, 116 (2d Cir.), *cert. denied*, 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977)); *see also United States v. Pelton*, 835 F.2d 1067 (4th Cir.1987), *cert. denied*, 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988); *United States v. Forbrich*, 758 F.2d 555 (11th Cir. 1985).

▉ The appellant was found guilty of attempted espionage by attempting to communicate documents and information relating to the national defense to a citizen of a foreign government. We note that the appellant was appropriately advised of the elements of attempted espionage, including the now disputed element. The appellant admitted the accuracy of those elements. Record at 64. We also note the military judge, counsel and the appellant devoted eleven pages of transcript to the issue of preparation vs. attempt. All were in agreement as to the providence of the appellant's plea. Ultimately, the appellant's guilty pleas were accepted and he received the

---

**4.** Article 106, UCMJ, 10 U.S.C. § 906 provided capital punishment for espionage in time of war. In peacetime, espionage could not be prosecuted under clause (3) of Article 134, UCMJ, as "crimes and offenses not capital" because the substantive violation, 18 U.S.C. § 794(a), was a capital crime. *United States v. French*, 10 U.S.C.M.A. 171, 27 C.M.R. 245 (1959). Under Article 106a, espionage is a capital offense. Attempted espionage, however, is not.

**5.** Most attempts under the Code are violations of Article 80, UCMJ, 10 U.S.C. § 880. There are, however, several attempt offenses that are specifically addressed in other articles. MCM, Part IV ¶ 4c(5). Attempted espionage is one of these. The element concerning "more than mere preparation" is not explicated under the MCM paragraph pertaining to attempted espionage. We believe, however, that the MCM paragraph pertaining to Article 80 attempts is also instructive as to Article 106a attempted espionage.

benefit of his plea bargain. Nonetheless, we have examined the record of trial in order to determine whether the appellant's admitted acts took him beyond that shadowy dividing line between mere preparation and attempt. We conclude that they did.

In determining whether the appellant's acts amounted to more than mere preparation, we have viewed the appellant's in-court admissions as a whole. Those admissions may be fairly summarized as follows:

In 1988, the appellant was ordered to active duty in the U.S. Naval Reserve and assigned to the aircraft carrier, USS MIDWAY, homeported in Yokosuka, Japan. Sometime after his arrival in Yokosuka, Japan, the appellant became acquainted with an individual, named "Alex." Alex informed the appellant that he was a citizen of the Soviet Union and provided the appellant with a business card reflecting Alex was a "Russian Trade Representative of the U.S.S.R." Prior to December of 1988, the appellant met with Alex several times. On the second contact, the appellant learned that Alex was interested in obtaining information relative to the national security of the United States and would pay for it. Specifically, Alex was interested in obtaining information concerning the F/A-18 aircraft. From that second meeting with Alex, the appellant believed Alex was a "spy." On one occasion, the appellant received "a little amount of money" from Alex.

On 9 November 1988, the appellant and a shipmate, named Electronics Warfare Technician Third Class Brown, traveled from Yokosuka to Tokyo and took a room in a military hotel. While there, they agreed they would furnish Alex with national defense information. The appellant did not have access to classified information. Petty Officer Brown did. Petty Officer Brown would obtain classified information and give it to the appel-

lant. The appellant would deliver it to Alex. Initially, the appellant wanted to obtain information concerning the F/A-18 aircraft. Petty Officer Brown advised that he could not get information concerning the F/A-18 aircraft, but could obtain up-to-date information on other weapons systems. The details of the information to be provided were not discussed at this time; nonetheless, they planned to acquire information and provide it to Alex. On the evening of 10 November 1988, the appellant and Brown went to the "Shibuya" district of Tokyo to meet Alex. The appellant met with Alex in a restaurant while Brown acted as lookout. The appellant's objective was to obtain money from Alex and to discuss the passing of classified information. The appellant had no documents to pass at this time, but he intended to try to obtain such documents. If he received any, he intended to pass them to Alex. In an alley outside the restaurant, the appellant informed Alex that he had a friend (Brown) who could supply "rocket information." Alex advised the appellant he had a contact that might be interested in this information.

The appellant and Alex spoke by telephone "a couple of times after" the 10 November meeting. These conversations were for the purpose of arranging meetings. The appellant arranged to meet Alex in Tokyo later in November 1988, but could not make the meeting because the appellant's liberty card had been "pulled." Petty Officer Brown needed money to pay a fine he had received for striking a Japanese. The appellant informed him he could go in the appellant's stead. Petty Officer Brown traveled to Tokyo to meet Alex, to obtain money from him, and to maintain the appellant's contact with Alex.[6]

In December 1988, the appellant reported the contacts he had had with Alex

---

6. The record does not indicate whether the meeting actually took place or whether anything was delivered by Petty Officer Brown to Alex. The military judge also explored the possibility that Petty Officer Brown and the appellant were only working a scam. Record at 91–92. From the entire providence inquiry, it appears that the appellant may have tried to obtain money from Alex without providing anything in return, but he was also prepared to provide classified information to Alex.

to the Naval Investigative Service (NIS). He did not receive specific instructions, but also did not understand these circumstances permitted him to have future contacts with Alex or relieved him of the obligation of reporting future contacts. The appellant did not inform NIS that the appellant expected to have further contact with Alex.[7]

On 8 May 1989, the appellant went on a trip with the ship's air department to the Tokyo Disneyland. There, the appellant "accidentally" saw Alex at a distance and walked over to him. Alex asked the appellant why he had not been able to contact the appellant, and the appellant gave him a telephone number through which the appellant could be reached. The appellant did not report this contact.

On 19 May 1989, at Yokosuka, Japan, the appellant received five naval messages from a radioman third class petty officer assigned to another ship. The petty officer represented the messages as being classified, however, the appellant only looked at two of them.[8] One of the two was classified as secret, the other as confidential. The secret message concerned the future utilization of the USS MIDWAY and coordination with Japanese authorities. The confidential message was a request for information concerning troop or unit movements. The appellant believed the messages related to the national defense of the United States. The appellant did not have authority to receive the messages and he intended the information would be used to the advantage of the Soviet Union.[9]

On the same day, Friday, 19 May 1989, the appellant took the five naval messages with him to Tokyo with the hope of contacting Alex. The appellant left the naval messages at a military hotel in Tokyo and went to look for Alex. The appellant spent Friday night, Saturday, and a part of Sunday looking for Alex. The appellant did not have a specific address for Alex, but sought him out in a night club district, called "Tokyo Roppongi." The Roppongi district is frequented by westerners. The appellant had previously seen Alex and his friends in the bars in this district. The appellant went from bar to bar looking for Alex or his friends. The appellant looked in the "same bars" in which he had seen Alex before. The appellant states that the Roppongi district had a couple of bars and he looked in several locations. The bars were within a three-minute walk of one another and "the length of the street that all of this would take place on would be roughly around two city blocks." If he did not find Alex, he hoped to find his friends through whom he could contact Alex. The appellant had contacted Alex in this way in the past. The appellant's intent was to show the naval messages to Alex to see if they were worth anything to Alex. The appellant's objective was to receive money. The appellant expected eventually to make contact with Alex by this method or others. On this occasion, however, the appellant found neither Alex nor his friends, and the five naval messages were never delivered to Alex.

In summary, the appellant: (1) had several meetings and contacts with a person the appellant believed to be a Soviet agent, (2) actively sought national defense information and sources of such information to provide it to that agent, (3) received money from the agent, (4) encouraged another sailor to travel to Tokyo to meet with the

---

7. The record of trial reveals no other information concerning the matters reported by the appellant to NIS.

8. Accordingly, the military judge considered only these two messages and disregarded the rest. Record at 58.

9. It appears from the record that the petty officer that provided the messages to the appellant was an informant of the Naval Investigative Service at the time the messages were provided to the appellant. Although not probed at trial, this circumstance would raise the possibility that the messages were not genuine. Even if the naval messages were bogus, it would not render the appellant's pleas improvident. It appears from the record that the appellant believed they were genuine and acted on that belief. The record also does not suggest that the appellant was entrapped. Record at 110.

agent in order to maintain contact with the agent, (5) provided a telephone number through which the agent could contact him, (6) received what appeared to be classified naval messages for the purpose of selling them to the Soviet government, (7) took the naval dispatches to a hotel in a foreign city for the same purpose, and (8) spent the weekend in that city searching the agent's customary haunts in order to make delivery. Civilian appellate courts have concluded that nearly identical facts constituted attempted espionage under the Espionage Act. *Pelton*, 835 F.2d at 1074 (travelling to Vienna and walking in a park for three days for the purpose of meeting a foreign agent constituted attempted espionage); *Forbrich*, 758 F.2d at 557 (leaving a motel room with concealed documents constituted attempted espionage); *United States v. Coplon*, 185 F.2d 629 (2nd Cir. 1950), *cert. denied*, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952) (meeting with a foreign agent and having incriminating documents in a purse constituted attempted espionage). Granted, the appellant's acts were not the last steps in order to complete delivery, but as we have noted, such is not required. The appellant was armed with the goods and went out of his way to effect delivery. The steps he took were substantial and evidenced the firmness of his criminal intent. *Byrd*, 24 M.J. at 290. In short, the appellant went beyond mere preparation.

■ We also do not believe that the appellant's providence inquiry raised the defense of voluntary abandonment. *See United States v. Rios*, 33 M.J. 436 (C.M.A. 1991). The appellant's failure in making delivery cannot be attributed to a change of heart. *Id.* at 440; *Byrd*, 24 M.J. at 292; *United States v. Miller*, 30 M.J. 999 (N.M.C.M.R.1990); *United States v. Walther*, 30 M.J. 829 (N.M.C.M.R.1990). The appellant expected to locate Alex eventually, and when the appellant did, he intended to show him the messages. Record at 68, 69, 73, 74, 77; *see also* Record at 101, 103, 108.

Accordingly, the appellant's pleas were consistent, provident and informed. Additionally, the sentence the appellant bargained for was appropriate under the circumstances. The convening authority considered the appellant's post-trial clemency matters. R.C.M. 1105. The fact that a co-conspirator received a different punishment for different offenses suggests to us that the parties received the individualized treatment they deserved. *E.g., United States v. Turner*, 30 M.J. 1276, 1283 (N.M.C.M.R.1990).

The findings and sentence, as approved on review below, are affirmed.

Senior Judge STRICKLAND and Judge ORR concur.