IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 6, 2005

## STATE OF TENNESSEE v. CURRIE LEE BYRD

**Direct Appeal from the Circuit Court for Tipton County**
**No. 4976     Joseph H. Walker, III, Judge**

---

**No. W2005-00999-CCA-R3-CD  - Filed January 5, 2006**

---

The defendant, Currie Lee Byrd, pled guilty to arson and vandalism over $60,000 and was sentenced to concurrent terms of three years and eight years, respectively, to be served under the supervision of a community corrections program after serving 140 days in jail.  He reserved as a certified question of law whether the trial court erred in denying his motion to suppress his statements. Following our review, we concur with the trial court's determination that the motion to suppress was without merit.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

J. Barney Witherington, IV, Covington, Tennessee, for the appellant, Currie Lee Byrd.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## <u>FACTS</u>

On June 27, 2004, at approximately 10:30 p.m., a fire destroyed a barn and related equipment belonging to David and Cindy Johnson of Brighton, Tennessee.  It was determined that the defendant, a volunteer fireman with the Three Star Volunteer Fire Department, had both been on the scene and placed the 9-1-1 telephone call reporting the fire.  The defendant gave a written "Fireman's Statement" to Special Agent Mike Woodyard of the Tennessee State Bomb and Arson

Unit on June 29, 2004, in the "day room" of the Brighton Fire Department.[1] Agent Woodyard testified, "I asked [the defendant] to give me a statement, as we would any other fire department personnel that might have been on scene, in particular because he was the first one on scene, and he may be able to advise us about the fire's behavior at that time." Present were Supervising Agent Jessica Shannon and Special Agent Ron Powers. Among other questions, the defendant was asked if he had made the 9-1-1 telephone call reporting the fire and responded that he had not. In his statement, the defendant said that he had not started the fire. Although he had not told the defendant, Agent Woodyard already was aware that, even though the Three Star Volunteer Fire Department had not been called to the scene, the defendant was at the scene when the Brighton Fire Department arrived and had been the one who had placed the 9-1-1 telephone call reporting the fire. The defendant then was told that there were some "problems" with his statement, and he was asked to join Woodyard in the fire chief's office. He was advised of his <u>Miranda</u> rights, executed a written waiver, and then gave the following statement:

> It was about 10:30 PM 6/27/04 Giltedge got a tone for a gin fire or right beside the jin [sic] something another. I went down there but I went the wrong way[.] [W]ound up at burluson gin[,] talked to a man there. Turned around and went back toward Daus [sic] house. Went out toward Johnson Farms and then [i]t hit me there already was a small camp fire. I set a small fire under the right side from the drive way [sic] then left. Went toward Munford called in the fire. Tones went off[.] I turned around about the truck and car . . . and went back from there.

> Q.  Did you set fire to the Johnson's barn?

> A.  Yes.

> Q.  Where did you set the fire in the barn?

> A.  Under the right side lean to facing the barn.

> Q.  What did you use to set the fire?

> A.  . . . matches.

> Q.  What material did you set on fire?

> A.  Loose hay on tin that was on the dirt floor.

> Q.  Was anyone with you when you set the fire?

---

[1] We have utilized the transcript of the hearing on the defendant's motion to suppress to set out the facts of this matter.

A.    No.

Q.    Why did you set the Johnson's barn on fire?

A.    No reason.  Just to see it.  I really didn't mean for the whole barn.  I wanted it to stay right there.

Q.    What happen[ed], did it get out of control on you?

A.    Yes.

Q.    What did you do then?

A.    I pulled the tin but it got to[o] hot & I left.

Q.    What did you do after you left?

A.    I called 911.  I got up to Atkins Store at the end of Mypon's Creek before I called.

Q.    What did you do after calling 911[?]

A.    I went up 51 and waited for the tone to come out.  I then called the Johnson's and went back.

Q.    Have you told anyone else about the fire[?]

A.    No.

Q.    Have you set any other fires?

A.    No.

Q.    Are you sure?

A.    I have not set any other fires.

Q.    Have you ever been arrested before?

A.    No.

Q.    What name did you give 911?

A.      I really don't remember.  I was pumping.

Q.      Are you aware that you are still under the oath to give a sworn statement?

A.      Yes.

A.      About 2 months ago.

Q.      Was that a house?

A.      It was a one room shack.  It did not have any insurance.  They had busted a meth lab in it.

Q.      Did you know the owner[?]

A.      Yes[,] I knew him from church.

Q.      Did he know you did or would burn it[?]

A.      No.

Q.      How did you set the Terry fire[?]

A.      There was a couch there I had some matches (wood).  I set the drap [sic] around the bottom of the couch on fire.

Q.      What time of the day was it[?]

A.      It was night.  I don't know what time.

Q.      Did you call that one in?

A.      Yes.  From my cell phone . . . .

Q.      Why did you set the house on Terry South on fire?

A.      At the time I was living in the area and me and my girlfriend would ride house [sic] and stuff like that.  They busted a meth lab in it.  I was thinking it was dangerous.  The man that owned it said he wished it would burn.

Q.      Is there anything that we have failed to ask you that you think we need to know[?]

-4-

A.    No, I've told ya'll [sic] everything.

On cross-examination, Woodyard said that as the defendant was being questioned in the office of the fire chief, the defendant and Agent Shannon were seated on the couch, and Woodyard and Agent Powers were sitting in chairs. Chief Gatlin was sitting behind the desk but likely was not present the entire time that the defendant was being questioned. Woodyard said that the defendant "was under investigation [but] not under arrest." Woodyard said that two agents were seated between the defendant and the doorway to the room. Chief Gatlin was "in and out" as the statement was being taken. Woodyard told the defendant that "it would be better for him to tell the truth" and that Woodyard "would certainly pass it on to the District Attorney's office that he was cooperative." The defendant neither testified nor presented any proof at the hearing.

At the conclusion of the hearing, defense counsel argued that the defendant's second statement was not voluntary because the statement had been taken in the presence of four officers "in a 12-by-15 room, with one couch, one desk, and three chairs and a coffee table, which makes for pretty cramped quarters. His exit [was] blocked, so certainly under his – he wouldn't feel free to go." In written findings of fact and conclusions of law, the trial court concluded that the motion to suppress should be denied because the "defendant made a knowing, voluntarily [sic] and intelligent waiver. He was not in custody at the time of the incriminating statement and had been advised of his rights and signed a waiver. He freely gave the statement as testified to by the officer."

## ANALYSIS

On appeal, the defendant argues that his "inculpatory statement was made based upon the officer's promises of leniency."

When this court reviews a trial court's ruling on a motion to suppress a confession from evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. Testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). The application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

In reviewing the defendant's claims that his confession was coerced, we first will set out in brief the salient testimony. Agent Woodyard testified that he advised the defendant of his Miranda rights and that the defendant appeared to understand them and said he wanted to "[g]ive a statement." As for the alleged coercion by Woodyard, he testified that he had "mentioned" to the defendant that "if he was to tell the truth, [Woodyard] would certainly pass it on to the District

Attorney's office that he was cooperative." Additionally, Woodyard said it was "likely" that he told the defendant if he gave a truthful second statement, he would not be prosecuted for his untruthful first statement.

As we will explain, we conclude that the trial court correctly determined that the authorities relied upon by the defendant in support of his claims are factually distinguishable from the present appeal.

In State v. Weltha Womack, No. E2003-02332-CCA-R3-CD, 2005 WL 17428, at *4 (Tenn. Crim. App. Jan. 4, 2005), an officer told the defendant he could "put a closure to" matters by making a statement and they could "do it without a lawyer . . . a court battle." This court held that these remarks "could only be reasonably interpreted . . . as a promise to avoid prosecution in exchange for [the defendant's] confession." Id. at *6. Thus, the statements were involuntary. By contrast, in the present appeal, Agent Woodyard said only that he would "pass it on" that the defendant had been truthful in his second statement.

In State v. Smith, 933 S.W.2d 450, 455-56 (Tenn. 1996), the defendant, who then was accused of aggravated sexual battery, told a mental health counselor that he had unlawful sexual contact with his stepdaughter. Subsequently, he argued that this statement should be suppressed, saying that he admitted his guilt to the counselor after being assured he would be given leniency by waiving his right to self-incrimination and would be prosecuted if he did not. Our supreme court concluded that the statement was not "compelled by impermissible threats or promises of leniency so as to render them involuntary," explaining that "[p]romises of leniency . . . do not render subsequent confessions involuntary *per se*," and "'[t]ruthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary.'" Id. at 456 (quoting United States v. Pelton, 835 F.2d 1067, 1073 (4th Cir. 1987)).

Applying these holdings to the present appeal, we conclude that the defendant failed to establish that his confession was involuntary. In making this determination, we first note, unlike that in Womack, the representation as to non-prosecution in this case was as to the making of the initial statement in which the defendant denied that he had set the fire, not that he could avoid prosecution for arson by admitting to it. Further weakening the defendant's claim is the fact that Agent Woodyard testified only that it was "likely" that he had said the defendant would not be prosecuted for making the false first statement. This equivocal response by Agent Woodyard does not establish that the statement was made. Accordingly, we conclude that the record supports the trial court's determination that the motion to suppress should be denied.

### CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

  ALAN E. GLENN, JUDGE

-6-