PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LUIS CRISTOBAL,

Defendant-Appellant.

No. 01-4505

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CR-00-83)

Argued: February 27, 2002

Decided: June 5, 2002

Before WILKINSON, Chief Judge, and WILLIAMS and
GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the opinion, in
which Chief Judge Wilkinson and Judge Williams joined.

## COUNSEL

**ARGUED:** Kelly Anne Halligan, LEVIT, MANN & HALLIGAN,
P.C., Ashland, Virginia, for Appellant. N. George Metcalf, Assistant
United States Attorney, Richmond, Virginia, for Appellee. **ON
BRIEF:** Paul J. McNulty, United States Attorney, Richmond, Virginia, for Appellee.

**OPINION**

GREGORY, Circuit Judge:

After a bench trial, Luis Cristobal was convicted on twenty-two counts of a twenty-three count indictment for, among other crimes, setting homemade explosive devices under two pickup trucks and at the door of an area business. On appeal, Cristobal contends that the district court erred in 1) denying his motion to suppress statements made while he was in the hospital, 2) rejecting his affirmative defense of insanity, 3) convicting him on two counts of maliciously damaging a vehicle used in or affecting interstate commerce, and 4) enhancing his sentence on three counts under 18 U.S.C. § 924(c)(1)(C).[1] For the reasons set forth below, we affirm.

I.

Sometime in 1998, appellant Luis Cristobal began experiencing personal problems that he claims were the result of his wife's philandering. By 2000, the couple had separated, and Cristobal blamed his wife for the breakdown in the marriage. Cristobal alleges that his stress over his wife's affairs "mutated into delusional psychosis."

During the early morning hours of February 7, 2000, Cristobal set homemade explosive devices in three locations. He placed one device under a pickup truck driven by David Haston, a man he suspected of having an affair with his wife. He placed the second device under a pickup truck driven by his wife's brother, Joseph Michael. Cristobal placed the last device outside a doorway of a building that housed Colonial Iron Works, Inc., a business owned and operated by Joseph Michael.[2]

---

[1]Cristobal's remaining sufficiency of the evidence arguments are all predicated upon his claim that the evidence did not show he fired his gun at Officer Melton. We have carefully reviewed the record and are satisfied that the evidence, viewed in a light most favorable to the prosecution, supports such a finding.

[2]The devices, which Cristobal began constructing days earlier, were made of steel box tubing, a broken lightbulb, black powder and shrapnel. The bomb placed at Colonial Iron Works was also made with a timing device, gasoline and acetylene gas.

Both explosive devices placed under the pickup trucks were designed to and did explode shortly after Haston and Michael started their engines later that morning. Haston and Michael sustained injuries, though their injuries were not life threatening. The device placed at Colonial Ironworks exploded at 5 a.m. that same morning. Fortunately, losses were minimal and no one was injured.[3]

After an initial investigation, Cristobal, who could not be located, was named as the primary suspect. Searches of his apartment and workplace uncovered additional evidence, including bomb making materials and a hand drawn picture depicting Cristobal surrounded by serpents, each serpent bearing the name of one of his victims.[4] A copy of this picture was also found in the beds of the pickup trucks after the bombings.

A search for Cristobal was undertaken by local, state, and federal authorities. On February 24, 2000, special agents of the Bureau of Alcohol, Tobacco and Firearms (BATF), acting on several leads, traveled to the Dinwiddie Church of Christ in Dinwiddie, Virginia in search of Cristobal. Virginia State Police Trooper Ed Melton, on special assignment with BATF, located a crawl space beneath the church altar area. Armed with a pistol in his fanny pack, Melton crawled into the space, which was approximately 17′(L) by 5′(W) by 2.5′(H). As Melton crawled through the space, he saw Cristobal crouched behind a stud wall. Melton shouted for Cristobal to "come on out," and when Cristobal did not respond, Melton removed the pistol from his pack.

---

[3]Cristobal had attempted to pour gasoline and acetylene under a doorway at Colonial Iron Works through a rubber tube so that when the bomb exploded it would cause the gasoline to ignite inside the building. The gasoline and acetylene did not fully ignite.

[4]A copy of the picture was found at Cristobal's workplace, and the original picture, in a frame, was found hanging on a wall in Cristobal's apartment. Behind the picture, investigators found a handwritten, encrypted note. Cristobal stipulated to the decryption of the note, which read:

> I will kill Jack Fred Dave and Reggi
> first Fred and ~~Jack~~ Dave
> then I'm going to Jacksonville kill Reggi
> and then I will be back and kill Jack Rick and Glen.

J.A. 119-20 (cross-out in original).

Melton shouted "Police" and commanded Cristobal to freeze, but again Cristobal did not respond. When Melton saw that Cristobal was armed and pointing a gun directly at him, he ordered Cristobal twice to drop the gun. Cristobal did not drop the gun. Melton then fired two volleys of shots at Cristobal, using approximately ten rounds. Cristobal was hit in the upper chest, right arm and elbow, right shoulder, and ring finger of his right hand. Seriously injured, Cristobal was pulled from the crawl space beneath the altar and transferred to the Medical College of Virginia in Richmond, Virginia.[5]

Cristobal's medical records indicate that following emergency surgery, he was placed in soft restraints because he had exhibited "threatening or dangerous behavior" to himself. The next morning, at approximately 10:00 a.m., Special Agents Brian Swann and Kristen Tomasetti spoke with Amy Chodrov, a registered nurse who was working in the surgical care trauma unit that day. Agent Swann spoke with Nurse Chodrov to ascertain whether Cristobal was mentally and physically capable of being interviewed. Nurse Chodrov informed Swann that Cristobal was oriented at that time, and Agent Swann began his interview with Cristobal at 10:17 a.m., while Agent Tomasetti took notes.[6]

Before asking Cristobal any questions that could be incriminating, Agent Swann read Cristobal his *Miranda* rights, which Cristobal waived. During the interview, which lasted just under an hour,[7] Cristobal confessed to setting the explosive devices. He communicated in English, his speech was not slurred, he never nodded off or slept, nor did he indicate in any way that he was under a narcotic stupor. Like-

---

[5]Following the incident at the church, forensic investigators searched the crawl space beneath the altar. In addition to the .45 caliber pistol Cristobal pointed and fired at Melton, they found an SKS assault rifle, changes of clothes, a wig, a stun gun, a gas mask, and a fourth explosive device that was similar in composition to those used against Haston and Michael.

[6]Unbeknownst to Swann, the court had appointed an attorney by telephone to represent Cristobal the same morning the interview took place.

[7]During this time, four breaks were taken. Medical staff checked on Cristobal during these breaks.

wise, Cristobal never asked to stop the interview, and his confession was detailed.[8]

On March 8, 2000, a Federal Grand Jury returned a twenty-three count indictment against Cristobal. He pled not guilty and moved to suppress his confession and suppress physical evidence seized pursuant to the February 7, 2000 search warrant. The district court allowed a lengthy suppression hearing, which included testimony from Cristobal's ex-wife, a previous employer, the trauma surgeon who performed Cristobal's surgery, the trauma resident and the registered nurse covering the hospital's intensive care unit after Cristobal's surgery. Several law enforcement agents, including agents Swann and Tomasetti, also testified at the hearing. The district court denied the motions, and after a two and a half day bench trial, convicted Cristobal on twenty-two counts of the indictment: 1) attempted voluntary manslaughter, in violation of 18 U.S.C. § 1112, 2) assaulting, resisting, or impeding a federal officer, in violation of 18 U.S.C. § 111, 3) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922, 4) using, carrying or discharging firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A), 5) three counts of possession of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(ii), 6) four counts of possession of a firearm made in violation of Chapter 53 of Title 26, 26 U.S.C. § 5861(c), § 5871, 7) four counts of possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d), § 5871, 8) four counts of unlawful making of a destructive device, in violation of 26 U.S.C. § 5822, § 5861(f), § 5871, 9) two counts of malicious damage and destruction of a vehicle used in interstate commerce or affecting interstate commerce, in violation of 18 U.S.C. § 844(i), and

---

[8]Later that afternoon, at approximately 3:30 p.m., Cristobal made further incriminating statements to Michael Talbert, a special agent with BATF who had been assigned to guard duty. Agent Talbert approached Cristobal after hearing Cristobal moaning. Cristobal stated that he was "so sorry" for making the officer (Trooper Melton) shoot him. Agent Talbert then followed up on Cristobal's apology with a few questions, without re-reading Cristobal the *Miranda* warnings. Agent Talbert explained that when he spoke with Cristobal, Cristobal appeared coherent. Cristobal did not nod off or slur his words, and he spoke to the officer in English.

10) malicious damage and destruction of a building used in or affecting interstate commerce, in violation of 18 U.S.C. § 844(i). The court sentenced Cristobal to a total of two life sentences plus 35 years.

## II.

We first examine Cristobal's claim that the district court erroneously denied his motion to suppress statements made while he was in the hospital. There is no dispute that Agent Swann obtained Cristobal's confession after advising Cristobal of his *Miranda* rights. Though he was advised of his rights, and though he indicated to Agent Swann that he wished to waive those rights, Cristobal asserts 1) that his *Miranda* waiver was not voluntary, knowing or intelligent, *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966), and 2) that his statements given after the waiver were involuntary and thus in violation of his Fifth Amendment right to due process. We address each contention in turn.

## A.

The inquiry into whether an individual waived effectuation of the rights conveyed in the *Miranda* warnings has two distinct dimensions. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). First, the relinquishment of the right "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* Cristobal insists that the totality of the circumstances demonstrates his waiver was not only involuntary, but was also not knowingly and intelligently given. After carefully reviewing the record, we find to the contrary on each assertion.

## 1.

Cristobal's statements must be suppressed if his decision to waive his Fifth Amendment privilege was involuntarily made. We engage in

the same inquiry when analyzing the voluntariness of a *Miranda* waiver as when analyzing the voluntariness of statements under the Due Process Clause. *See Colorado v. Connelly*, 479 U.S. 157, 169 (1986) ("There is obviously no reason to require more in the way of a "voluntariness" inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context."). The test for determining whether a statement is involuntary under the Due Process Clause "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired,'" *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *see also United States v. Dickerson*, 530 U.S. 428, 434 (2000), because of coercive police conduct. *Colorado v. Spring*, 479 U.S. 564, 574 (1987). To determine whether a defendant's will has been overborne or his capacity for self determination critically impaired, courts must consider the "totality of the circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. *Pelton*, 835 F.3d at 1071. Though an appellate court must make an independent determination on the issue of voluntariness, the district court's findings of fact on the circumstances surrounding the confession are to be accepted unless clearly erroneous. *Id.* at 1072. Our review of the record leads us to conclude that Cristobal's waiver was indeed voluntary. We cannot find, as Cristobal asserts, that his will was overborne by the circumstances of the hospital interrogation.

Historically, cases of gross abuse have allowed courts to easily deem certain confessions involuntary. Undoubtedly, an accused's will may be overborne when he or she is subjected to severe physical abuse, *see Brown v. Mississippi*, 297 U.S. 278 (1936), held incommunicado and questioned for over 36 hours without sleep or rest, *see Ashcraft v. Tennessee*, 322 U.S. 143 (1944), given "truth serums," *see Townsend v. Sain*, 372 U.S. 293 (1963), or threatened with a loaded gun while wounded, *see Beecher v. Alabama*, 389 U.S. 35 (1967). The crucial difference between these cases and the case at hand is that Cristobal's waiver (and subsequent confession) was not the result of coercive police activity.

Coercive police activity is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. *Connelly*, 479 U.S. at 167;

*United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc). As such, coercive police activity is also a necessary predicate to a finding that a waiver of *Miranda* rights is not voluntary. *Connelly*, 479 U.S. at 169-70. In determining whether a defendant's will has been overborne, the Court has focused on the "crucial element of police overreaching." *Id.* at 163 (collecting cases). While each case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, "all have contained a substantial element of coercive police conduct." *Id.* at 163-64.

The fact that Cristobal had been given pain killers and narcotics such as morphine is not enough to render his waiver involuntary. In making a determination on whether one's will has been overborne, we certainly must take into consideration "the characteristics of the defendant." *Pelton*, 835 F.2d at 1071. However, a deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary. *See Connelly*, 479 U.S. at 164-65. "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Connelly*, 479 U.S. at 165.

Because we cannot look to mental condition alone when determining the voluntariness of Cristobal's waiver, we must ultimately focus on the actions of the law enforcement officials to determine if police overreaching occurred in this case. We find that it did not. The evidence here does not show that law enforcement officials exploited Cristobal's weakened condition with coercive tactics. *See Connelly*, 479 U.S. at 165. Cristobal never requested not to be interviewed due to pain. *See United States v. Guay*, 108 F.3d 545, 550 (4th Cir. 1997). No officer harmed or threatened to harm Cristobal if he did not waive his rights and answer Agent Swann's questions. In fact, Agent Swann did not pressure Cristobal in any way to waive his rights. Rather, Agent Swann was careful to 1) ensure that Cristobal was alert before speaking with him, 2) introduce himself to Cristobal and advise Cristobal of the nature of the investigation, 3) read Cristobal his *Miranda* rights, and 4) make sure, even after the waiver, that Cristobal was in fact a willing participant. While there were other agents in the hospital room at the time of the interview (taking notes or serving as

guard), no other agents engaged in conversation with Cristobal. This is simply not a case where law enforcement has attempted to "wring[ ] a confession [or *Miranda* waiver] out of an accused against his will." *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960).[9]

### 2.

Because a waiver may very well have been voluntary (that is, uncoerced) and yet given without a knowing and intelligent waiver of *Miranda* rights, *see Moran v. Burbine*, 475 U.S. at 421, it is not enough for us to find that Cristobal voluntarily waived his rights. We must also determine whether the waiver was knowing and intelligent. Unlike the issue of voluntariness, police overreaching (coercion) is not a prerequisite for finding that a waiver was not knowing and intelligently made. *Id.*; *see United States v. Bradshaw*, 935 F.2d 295, 299 (D.C. Cir. 1991).

Reviewing the totality of the circumstances, we find that Cristobal understood he had the right to remain silent and that anything he said could be used as evidence against him. *See Colorado v. Spring*, 479 U.S. 564, 574 (1987). As the district court found, though Cristobal was born in Cuba, he was equally capable in English and Spanish.

---

[9]Cristobal seems to suggest that coercion and police overreaching occurred here merely because the agents did not wait until Cristobal was released from the hospital or transferred out of intensive care before subjecting him to questioning. We cannot, without serious repercussions, agree with this argument. If police conduct could be deemed coercive simply because an interrogation occurs while a suspect is in the hospital, law enforcement officers would be faced with a serious dilemma—wait until suspects are released (and thus risk losing valuable crime-solving or further crime-preventing information), or risk suppression of statements necessary for conviction. We certainly recognize that there are many scenarios that could render a hospital confession involuntary. Because, in many instances, hospital patients are weakened physically and perhaps mentally, law enforcement officials must be cautious not to exploit suspects' conditions with coercive tactics. In this case, Agent Swann certainly acted with caution, and as such, the circumstances here do not warrant a finding of involuntariness. The mere fact that Agent Swann did not wait to interview Cristobal does not amount to police overreaching.

Cristobal's ability to understand his rights was not hindered in any way by the fact that English was his second language. The evidence also showed that Cristobal had been Mirandized on at least one other occasion.

Because we find no coercive police activity (and thus the waiver was voluntary), it is in our inquiry into whether Cristobal's waiver was knowing and intelligent that his mental condition due to the pain killers and narcotics is the most relevant. Pain, on its own, will generally not suffice to render a waiver invalid. However, we recognize that there are situations where, after receiving certain painkillers and other narcotics, a person might be incapable of making a reasoned decision to abandon his or her rights.

Unfortunately for Cristobal, nothing in the record indicates that he was incapable of giving a knowing and intelligent waiver of his rights. The record merely evidences the *amount* of medication Cristobal received, it does not establish the medication's *effect* on Cristobal. As such, we cannot speculate whether the amounts given to Cristobal could have affected his judgment or rendered him incapable of making an informed decision or incapable of thinking rationally.

There simply is no evidence that the drugs had an adverse effect on Cristobal's ability to think rationally. To the contrary, the uncontroverted medical testimony before us indicates that Cristobal was alert and coherent at the time of the interview. Medical records indicating that a suspect had been given narcotics, with no supporting evidence as to the effects of those narcotics (on the individual or even in general) are not sufficient to render a waiver of *Miranda* rights unknowing or unintelligent. Were we to find Cristobal's waiver not knowing and intelligent based on these facts and with no evidence of the effects of the medication on him, we would essentially be stating that whenever a defendant can show that he was given medication, his *Miranda* waiver was *per se* ineffective. This is a step we are quite unwilling to take.[10] Accordingly, the district court was correct in finding that Cristobal's *Miranda* waiver was knowing and intelligent.

---

[10]Cristobal also claims that his waiver was invalid because the morning of the interview, the court had, on its own, appointed counsel to represent

## B.

In addition to arguing that his waiver was invalid, Cristobal also asserts that his statements, all given *after* the waiver, were involuntary under the Fifth Amendment, which guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law." U.S. Const. amend. V. Because we find that Cristobal's waiver was given voluntarily, and because we find no intervening coercion on the part of the agents, it follows that the statements given after the waiver were voluntary as well. Thus, Cristobal's argument here is without merit.

Cristobal relies heavily on *Mincey v. Arizona*, 437 U.S. 385 (1978), where the Supreme Court found a hospital confession was involuntarily given. This, however, is *not* a case where the circumstances of a hospital interview necessitate a finding of involuntariness. *Mincey* is easily distinguished.

In *Mincey*, the "barely conscious" suspect, "depressed almost to the point of coma," *expressed his wish not to be interrogated without a lawyer on numerous occasions*. *Mincey*, 437 U.S. at 399 (emphasis added). Many of Mincey's answers were unresponsive, and he complained to the officer interrogating him that he was confused and unable to think. *Id.* at 400. Despite Mincey's "entreaties to be let alone," the officer only ceased the interrogation during intervals when Mincey lost consciousness. *Id.* at 401. The Court found that Mincey's statements were "not the product of his free and rational choice," and that his will was "simply overborne." *Id.* at 401-02.

Here, the record clearly reflects that Cristobal waived his *Miranda* rights *before* any questioning began. After his waiver, Cristobal never

---

him and he was not notified of counsel's existence, nor was his counsel notified of the interrogation. The evidence shows that Agent Swann was not aware that the court had appointed counsel. However, because Cristobal's voluntary decision to speak was made with full awareness and comprehension of his *Miranda* rights, the waiver was valid, even if it could be shown that the police knew counsel had been appointed and concealed that fact from Cristobal. *Moran v. Burbine*, 475 U.S. 412, 423-24 (1986).

asked for the questioning to stop. He never indicated a desire not to confess. No agent harmed or threatened to harm Cristobal if he did not answer their questions. He was not purposely held incommunicado or in seclusion, and he was not subjected to continuous and unrelenting questioning. *See United States v. Van Metre*, 150 F.3d 339, 348 (4th Cir. 1998). Unlike the suspect in *Mincey*, Cristobal's answers to questions were lucid and in fact very detailed. Cristobal explained, among other things, how he had constructed the explosive devices, what materials he used, and the order in which he placed the explosive devices in the various locations. He explained where he had been and what he had been doing in the time between the bombings and his apprehension, and he informed Agent Swann about the manner in which he had obtained the other weapons he possessed while under the crawl space in the church. Though it was obvious to the officers that Cristobal was in pain, he did not slur his words during the interview, he never lapsed into unconsciousness, nodded off or went to sleep. When asked, on more than one occasion, how he was feeling and whether he wanted to continue, he responded that he wished to continue the interview. During the interview, Cristobal appeared to the agents to be contrite and anxious to respond to questions to explain what had happened and why. For all these reasons, we find that Cristobal's confession was indeed voluntary. The district court did not err in denying Cristobal's motion to suppress.

III.

Cristobal next argues that the district court, acting as fact finder, erred in rejecting his insanity defense. Under the Insanity Defense Reform Act of 1984, a defendant who raises the affirmative defense of insanity has the burden of proving, by clear and convincing evidence, that at the time of the offense, he was unable to appreciate the nature and quality or the wrongfulness of his acts because of a severe mental disease or defect. *See* 18 U.S.C. § 17.

In this case, two qualified psychiatrists examined Cristobal and arrived at differing opinions. Both testified at trial. Dr. Artigues, for the government, concluded that Cristobal was not suffering from any severe mental disease or defect at the time of the alleged offense. On the other hand, Dr. Giorgi-Guarnieri, for the defense, testified that Cristobal was suffering from a major depressive episode with psy-

chotic features. However, Dr. Giorgi-Guarnieri conceded that individuals suffering from severe depressed episodes with psychotic features are not always incapable of understanding the nature of their acts. The district court made note of this concession when it rejected Cristobal's insanity defense at the close of the evidence. The court explained that insufficient evidence existed to show that Cristobal "was unable to understand what he was doing." In making this determination, the district judge credited Dr. Artigues' opinion, noting that she had examined Cristobal for over twenty hours.[11] Assessing and evaluating the strength and weaknesses of two experts' conflicting testimonies is a task particularly within the fact finder's province, and here the district judge was not clearly erroneous in finding that Cristobal did not prove insanity by clear and convincing evidence. *See United States v. Freeman*, 804 F.2d 1574, 1577 (11th Cir. 1986).

IV.

Cristobal further asserts that we should reverse two of his convictions for violations of 18 U.S.C. § 844(i) because the government did not prove that the two pickup trucks under which he placed explosive devices had a legally sufficient nexus to interstate commerce.[12] We disagree. The evidence, in the light most favorable to the government, demonstrates that both pickup trucks were used in activities affecting interstate commerce. *See United States v. Carr*, 271 F.3d 172, 178 (4th Cir. 2001) (explaining that a claim of an insufficient connection to interstate commerce is a challenge to one of the elements of the government's case, and is therefore considered a sufficiency of the evidence claim). Substantial evidence existed in the record to support the district judge's finding of the essential elements of § 844(i)

---

[11]Dr. Giorgi-Guarnieri saw Cristobal for a total of seven hours.

[12]Section 844(i) provides, in pertinent part:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate commerce shall be imprisoned for not less than 5 years and not more than 20 years.

18 U.S.C. § 844(i).

beyond a reasonable doubt.[13]    *See Glasser v. United States*, 315 U.S. 60, 80 (1942).

Victims David Haston and Joseph Michael did not own the pickup trucks they were driving when the explosive devices set by Cristobal detonated. Rather, both vehicles were owned by commercial businesses.[14] Both businesses held title to the vehicles and were responsible for insurance on the vehicles. Not only were the vehicles owned by commercial businesses, the evidence established that those businesses were clearly engaged in interstate commerce.[15]

---

[13]Cristobal further contests the finding that Joseph Michael received "personal injury" as a result of the explosive device that detonated under his truck, as charged in Count 9 of the indictment. While § 844(i) sets the punishment for damaging or destroying property used in interstate commerce at no less than 5 years and no more than 20 years, "if personal injury results to any person . . . as a direct or proximate result of the conduct prohibited by this subsection," a person "shall be imprisoned for not less than 7 and not more than 40 years." We reject Cristobal's argument here because the evidence clearly establishes that Michael was in fact injured by the explosion.

The fact that Michael did not visit a hospital immediately following the incident does not preclude a finding that he sustained personal injury. The record indicates that Michael's legs were sore from the blast, he experienced severe headaches, was diagnosed with a concussion, and saw several other doctors about his headaches.

[14]The 1988 Mazda truck driven by Haston was owned by his employer, HyTech Parking Maintenance, Inc. (HyTech), which is primarily in the business of sweeping, seal coating, and striping roadways in Virginia. The evidence presented at trial established that while most of HyTech's services are performed on roadways in Virginia (including Interstate 95), HyTech has at least one client with corporate offices out of the state. Furthermore, HyTech's president testified that the company buys its equipment from all over the United States.

The second pickup truck, driven by Joseph Michael, was owned by Colonial Iron Works, Inc. Michael is, in fact, the president and owner of Colonial Iron Works, a small company that assembles and sells iron railings. The railings are sold in Virginia, but, like HyTech, Colonial Ironworks purchases most of its component parts from out of state.

[15]Indeed, Cristobal does not appeal his conviction under Count 19 for damaging or destroying the building that contained Colonial Ironworks, Inc., *a business engaged in interstate commerce*. 18 U.S.C. § 844(i)(emphasis added).

Despite this apparent connection to interstate commerce, Cristobal argues that the primary function of both vehicles was in fact for personal rather than business use. In support of this argument, Cristobal notes that both Haston and Michael testified that they primarily used the trucks to drive to and from work. Additionally, Cristobal points us to Michael's statements that he had on occasion used his pickup truck to transport his children and for other recreational purposes.

Cristobal attempts to rely on the Supreme Court's recent decision in *Jones v. United States*, 529 U.S. 848 (2000), where the Court held that § 844(i) did not reach the arson of an owner-occupied private residence that was not used for any commercial purpose. 529 U.S. at 859. Because the evidence presented in this case presents a substantially different set of facts than those in *Jones*, Cristobal's reliance on *Jones* is indeed misplaced.

In *Jones*, the Court found that a house, used *solely* as a private residence for "everyday family living," and not used for any commercial purposes does not qualify as property "used in" commerce or "used in" commerce affecting activity. *Id.* (emphasis added). *Jones* established a two-part inquiry to determine whether a building (or property) fits within the strictures of § 844(i). *See also United States v. Terry*, 257 F.3d 366, 368-69 (4th Cir. 2001). Courts must first inquire into the function of the property itself. *Jones*, 529 U.S. at 854. Second, courts must determine whether "that function affects interstate commerce." *Id.* Because § 844(i) does not invoke Congress' full authority under the Commerce Clause, the Court explained that the qualification "'used' in an activity affecting commerce" is "most sensibly read to mean active employment for commercial purposes, and not merely passive, passing, or past connection to commerce." *Terry*, 257 F.3d at 369 (quoting *Jones*, 529 U.S. at 855); *see also*, *United Sates v. Carr*, 271 F.3d 172, 177 (4th Cir. 2001).

Here, the evidence shows that the primary function of both pickup trucks was to transport Haston and Michael to and from their work.[16] As such, both pickup trucks were clearly used for the purpose of

---

[16]Haston also traveled to and from specific paving and sealing jobs in the pickup truck. He traveled out of the state in the truck on at least one occasion to quote a job to a corporate customer.

advancing and promoting the business of HyTech and Colonial Iron Works, commercial entities that dealt in interstate commerce.[17] Hence, the evidence sufficiently established that the vehicles specified in counts 9 and 14 were used in activities affecting interstate commerce, and not used merely for private purposes. The company trucks were actively employed for commercial purposes, with more than a passive, passing or past connection to commerce. *See Jones*, 529 U.S. at 855.

V.

Lastly, Cristobal contends that his enhanced sentences for counts 5, 10 and 15 under 18 U.S.C. § 924(c)(1)(C) violate *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the phrase "second or subsequent conviction" states an element of the offense that must be charged in the indictment and found beyond a reasonable doubt.[18] We find no merit to this argument for two reasons.[19]

---

[17]Before the bombing, the pickup truck driven by Michael even featured magnetic signs advertising Colonial Iron Works on its doors.

[18]18 U.S.C. § 924(c)(1)(C) states:

In the case of a second or subsequent conviction under this subsection, the person shall —

(i)   be sentenced to a term of imprisonment of not less than 25 years; and

(ii)  if the firearm involved is a machine gun or a destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life.

The district judge (as fact finder) found Cristobal guilty of possessing an SKS assault rifle on February 24, 2000, during and in relation to a crime of violence (Count 5), and guilty of possessing two improvised explosive devices (placed under the vehicles driven by Michael and Haston) on February 7, 2000, during and in relation to a crime of violence (Counts 10 and 15). Counts 5, 10, and 15 were correctly recognized as second or subsequent § 924(c) convictions because Cristobal was convicted on Count 4 under § 924(c)(1)(A)(iii). Cristobal was sentenced to twenty-five years on Count 5 under § 924(c)(1)(C)(i) and he received life in prison on Counts 10 and 15 under § 924(c)(1)(C)(ii).

[19]Cristobal also argues that the court should have allowed his enhanced sentences under § 924(c)(1)(C) to run concurrently. This assertion stands

A.

*Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that *increases the penalty for a crime beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490 (emphasis added). Because § 924(c)(1) contains no maximum penalty, the application of § 924(c)(1)(C)(i) and § 924(c)(1)(C)(ii) did not expose Cristobal to a penalty greater than that already allowed under the statute. *See United States v. Harris*, 243 F.3d 806, 808-10 (4th Cir. 2001), *cert. granted*, 122 S.Ct. 663 (2001); *United States v. Harrison*, 272 F.3d 220, 225-26 (4th Cir. 2001). Finding that Cristobal's § 924(c) offenses were "second or subsequent" offenses under § 924(c)(1)(C)(i) and § 924(c)(1)(C)(ii) merely triggered certain mandatory minimum sentences, thus cabining the district court's discretion when imposing a sentence for the base offenses in § 924(c)(1), for which the maximum penalty is life. *Harris*, 243 F.3d at 226.

B.

Furthermore, notwithstanding the fact that the enhancements under § 924(c)(1)(C)(i) and § 924(c)(1)(C)(ii) did not increase the penalties beyond § 924(c)(1)'s statutory maximum, we find that the enhancements fall squarely within *Apprendi*'s prior conviction exception. *Apprendi*, 530 U.S. at 490 ("*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Cristobal urges us to find that *Apprendi* overruled the prior conviction exception in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). Unfortunately for Cristobal, this Circuit has expressly held that *Amendarez-Torres* survives *Apprendi*. *United*

---

in direct contradiction to § 924(c)(1)(D)(ii), which unambiguously states that "no term of imprisonment imposed on a person under this subsection shall run concurrently with *any other term of imprisonment imposed on the person*, including any terms of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed." 18 U.S.C. § 924(c)(1)(D)(ii) (emphasis added). Hence, the court correctly sentenced Cristobal to consecutive sentences for his § 924(c)(1) violations.

*States v. Sterling*, 283 F.3d 216, 220 (4th Cir. 2002) (finding that prior convictions were properly used to enhance a defendant's sentence under the Armed Career Criminal Statute, 18 U.S.C. § 924(e)).[20]

In the alternative, Cristobal argues that § 924(c)(1)(C) enhancements should fall outside of the prior conviction exception to *Apprendi* because *Apprendi* "does not specifically address 'second or subsequent convictions.'" Appellant's Opening Brief at 55. This argument is patently meritless. In order for a § 924(c) conviction to be a second or subsequent conviction, a defendant obviously must have been convicted of a first or "prior" § 924(c) offense. We will not invent a distinction where clearly none exists. We find that the fact that a § 924(c) conviction may be a "second or subsequent" conviction under that subsection need not be charged in the indictment or proved beyond a reasonable doubt.

## VI.

Accordingly, we affirm all aspects of Cristobal's conviction and sentence.

*AFFIRMED*

---

[20]Cristobal's argument that the enhanced penalty provision of § 924(c)(1)(C) creates a separate offense is also foreclosed by *Deal v. United States*, 508 U.S. 129 (1993); *see also United States v. Anglin*, 284 F.3d 407, 411 (2d Cir. 2002). In *Deal*, the Court found that the enhanced penalty provision for a "second or subsequent" § 924(c)(1) conviction applies where, as in Cristobal's case, the "second" conviction is obtained in the same prosecution (and the same judgment) as the "first" conviction. 508 U.S. at 131-35. The Court's decision in *Deal* makes sense only if the fact of a previous "conviction" is a *sentencing factor*, and not an *element* of an additional offense that Congress intended to create. *Anglin*, 284 F.3d at 411 (emphasis added). If we considered the fact of a "first" conviction to be an element, then a prosecutor seeking to prove multiple § 924(c)(1) offenses against a defendant who had not previously been convicted of such an offense would have the "impossible task of presenting evidence of 'the finding of guilt by a judge or jury' which had not yet occurred." *Id.* However, if the "first" conviction is a sentencing factor, then the judge is obviously aware of whether "the finding of guilt" with respect to more than one § 924(c)(1) violation had occurred. *Id.*