UNITED STATES of America,

v.

Edgar Javier BELLO–MURILLO, Defendant.

Case No. 1:13–cr–00310–GBL–3.

United States District Court, E.D. Virginia, Alexandria Division.

Signed Nov. 24, 2014.

**490**

Michael Ben'Ary, Stacey K. Luck, U.S. Attorney's Office, Alexandria, VA, for United States of America.

John C. Kiyonaga, The Law Office of John C. Kiyonaga, Alexandria, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

GERALD BRUCE LEE, District Judge.

This matter is before the Court on Defendant Edgar Javier Bello–Murillo's Motion to Suppress Statements ("Motion to Suppress") (Doc. 105). On July 18, 2013, a federal grand jury returned an indictment charging Defendant Bello–Murillo and five of his co-defendants with (1) murder of an internationally protected person and aiding and abetting that murder in violation of 18 U.S.C. §§ 2, 1116(a), (c); (2) conspiracy to kidnap an internationally protected person in violation of 18 U.S.C. § 1201(c); and (3) kidnapping an internationally protected person and aiding and abetting that kidnapping in violation of 18 U.S.C. §§ 2, 1201. A seventh co-defendant was charged with obstructing an official proceeding in violation of 18 U.S.C. § 1512(c). *See* Doc. 15.

Defendant seeks to suppress all of his statements made in connection with this case following his initial contact with investigators (Doc. 105). Defendant claims that he was subject to verbal and physical coercion which rendered the waiver of his *Miranda* rights involuntary. *Id.* Defendant also argues that coercive government tactics during his custodial interview should result in the suppression of his subsequent voluntary statements to Colombian media outlets. *Id.*

The first issue before the Court is whether Defendant made a knowing, voluntary and intelligent waiver of his *Miranda* rights where he signed the Spanish language *Miranda* rights waiver forms. The second issue is whether the exclusionary rule applies to voluntary statements made by Defendant to Colombian media outlets.

The Court denies Defendant's Motion to Suppress because the Government has demonstrated, by a preponderance of evidence, that Defendant's post-arrest statements were made voluntarily, after a knowing and intelligent waiver of his *Miranda* rights. Furthermore, Defendant's statements to Colombian media outlets were not only voluntary, they were made to non-government actors. Therefore, the Fifth Amendment's exclusionary rule does not apply to Defendant's non-custodial statements to Colombian media outlets, and thus, these statements are admissible.

## I. Background [1]

As alleged in the indictment, Defendant along with five of his co-defendants were involved in a scheme to commit "millionaire's rides" in Bogota, Colombia. On June 20, 2013, defendants targeted DEA Special Agent James Terry Watson ("SA

---

1. The background section is taken directly from the Government's Notice of Intent to Offer Evidence Pursuant to Federal Rule of Evidence 404(B) and Supporting Memorandum (Doc. 138).

Watson"). At approximately 11:00 p.m., SA Watson left a restaurant in Bogota, where he had been dining with Drug Enforcement Agency ("DEA") and international law enforcement colleagues. SA Watson hailed a taxi ("Taxi # 1") in the Parque 93 area of Bogota, a popular and affluent neighborhood known for high-end dining and shopping establishments. Defendant Garcia Ramirez drove Taxi # 1. Once SA Watson entered Taxi # 1, Garcia Ramirez engaged SA Watson in conversation in Spanish and determined that SA Watson was seeking a ride to the Marriott Hotel in Bogota. As soon as Taxi # 1 began to travel, a second taxi ("Taxi # 2"), driven by Defendant Lopez, pulled up behind Taxi # 1. Defendants Figueroa Sepulveda, Bello–Murillo, and Gualtero were riding in Taxi # 2. A third taxi driver ("Taxi # 3") was originally part of the robbery crew, but the taxi encountered mechanical problems shortly before Taxi # 1 picked up SA Watson. The defendants intended for the driver of Taxi # 3 to obtain the victim's automatic teller machine ("ATM") and credit cards, and take them to the ATM to withdraw cash from the victim's bank accounts using Personal Identification Numbers (PINs).

After a short drive, Defendant Garcia Ramirez alerted the other defendants that SA Watson would their next robbery victim. Using a previously agreed upon signal, Defendant Garcia Ramirez alerted his co-defendants by pumping the brakes of his taxi to act as if it were experiencing engine trouble. Defendant Lopez confirmed his understanding of the plan by flashing the headlights of his car. Taxi # 1 then came to a stop, and Taxi # 2 pulled up directly behind it. Defendants Figueroa Sepulveda and Bello–Murillo got out of the back seat of Taxi # 2 and got into the back seat of Taxi # 1, one on each side of SA Watson. Defendant Figueroa Sepulveda used a stun gun in an attempt to incapacitate SA Watson, and SA Watson struggled. During the fracas, Defendant Bello–Murillo stabbed SA Watson several times with a knife.

SA Watson was able to break free but collapsed a short distance later. Colombian National Police officers arrived soon thereafter and placed SA Watson in their vehicle. They took him to the hospital, where he was pronounced dead shortly thereafter. The cause of SA Watson's death was blood loss as a result of multiple stab wounds.

Defendant argues that the manner in which the DEA agents secured the first *Miranda* waiver on June 25, 2013 "completely overbore [his] life, his ability to decide for himself because he was scared for his life." Defendant claims that he cooperated by signing the statement of rights form because he was in fear for his life. Defendant contends, because his first *Miranda* waiver is invalid, all statements he made to law enforcement and the Colombian media outlet should be suppressed.

The Government argues that Defendant's statements were made voluntarily as Defendant was informed of his *Miranda* rights in English, Spanish, and in writing at each interview with United States law enforcement agents on June 25, 2013 and June 27, 2013. The Government attacks Defendant's claims that his statements were verbally and physically coerced because the interviews were conducted in rooms with glass walls and doors. Finally, the Government argues that there is no legal precedent that supports the exclusion of statements Defendant made to Colombian media outlets.

## II. Standard of Review

■ The legal standards governing a motion to suppress are clear. The burden of proof is on the party who seeks to

suppress the evidence. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance ·of the evidence."). Where a defendant seeks to suppress a statement under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Matlock*, 415 U.S. at 178, 94 S.Ct. 988.

In the course of deciding a motion to suppress, the district court may make findings of fact, as well as rulings of law. *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir.2005) (citations omitted). "At a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir.1993); *see also Columbus–Am. Discovery Group v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir.1995) ("In the usual case, the fact finder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example.").

## III. Suppression Hearing

The Court held an evidentiary hearing on October 6, 2014. Having heard the testimony of the witnesses and considered the demeanor and credibility of the witnesses, the Court renders the following findings of fact and conclusions of law.

Special Agent Andres Quintero ("SA Quintero") testified that on June 25, 2013 Defendant was arrested by Colombian law enforcement agents. Following a medical examination that revealed no issues, SA Quintero and three other United States law enforcement agents, Manny Martinez, Ivan Carrera and Mike Suau, met with Defendant in an office at the Directorate of Criminal Investigation and Interpol ("DIJIN"), a division of the Colombian National Police. The office, which was assigned to a Colombian National Police official, had glass walls and a glass door. This office was not typically used for conducting interviews and was not equipped with suitable recording equipment. During the meeting, there were no Colombian National Police personnel in the room. Defendant was brought into the room in handcuffs, but those handcuffs were removed during the interview. No Colombian law enforcement officer, agents, or other personnel were in the office during the interview. The United States law enforcement agents were dressed in plain clothes, and SA Quintero was armed.

SA Quintero and the other three agents identified themselves as United States law enforcement agents and showed Defendant their credentials. The agents spoke to Defendant in Spanish. Agent Quintero recalled that Defendant was provided with water and allowed to use the restroom two or three times during the interview. Defendant was also questioned about his medical status and he reported he was feeling okay. SA Quintero stated that during the interview Defendant was emo-

tional at times despite the calm atmosphere.

SA Quintero testified that he and the other agents read aloud the *Miranda* rights form in Spanish. Thereafter, Defendant initialed each paragraph, indicating that he understood its contents and signed the bottom of the form indicating that he wished to speak with the agents. *See* Government's Exhibit A. According to SA Quintero, Defendant proceeded to give a full statement. Defendant expressed remorse and cried several times throughout the interview. Defendant was concerned that if he was sent to jail he would be separated from his family, in particular, his son. SA Quintero recalled providing Defendant with tissue to wipe his eyes on several occasions. Defendant did not request to stop the interview at any time. Nor did Defendant request an attorney. At the end of the interview, Defendant agreed to meet with the agents a second time to answer follow up questions. The interview lasted three and a half hours.

On June 27, 2013, SA Quintero, agents Manny Martinez, Ivan Carrera and Mike Suau, and a United States law enforcement analyst met with Defendant at the offices of the DIJIN division of the Colombian National Police. The meeting took place in a conference room, containing a conference table and chairs. Defendant was advised of his rights, both orally and in writing using a Spanish language form. Defendant initialed each paragraph of the form, indicating that he understood his rights, and indicated, orally and in writing, that he wished to waive his rights and proceed with the interview. *See* Government's Exhibit B. SA Quintero testified that at one point during the interview, Defendant commented that he had not invoked his right to remain silent because he wanted to give truthful statements. At no point did Defendant ask to stop the interview or request an attorney. The interview lasted approximately three and a half hours.

SA Quintero noted that at the time of the interview it was not customary for United States law enforcement agents to record interviews. It has since become the policy of the Department of Justice to record interviews. SA Quintero denied ever having met SA Watson or having any bias against Defendant.

Defendant took the stand and recounted the events surrounding his arrest. Defendant testified that at approximately 6:30 a.m. on June 25, 2013, a large number of Colombian National Police accompanied by several United States DEA agents banged on his door at his residence. As he opened the door, police officers forced their way into through into Defendant's home. He was immediately grabbed, handcuffed, and thrown to the ground. There were twenty or thirty police officers in uniforms carrying pistols and rifles. Defendant stated that he was thrown face-down on the floor while a police officer put his knees in his back while handcuffing him. Defendant did not identify whether the police officer was a Colombian national police officer or a United States DEA agent. He was then placed against the wall and photographed. Defendant believed that the police officers who photographed him were DEA agents because the agents spoke English with an accent. Defendant testified that he was later told by the Colombian police officers that the agents were, in fact, DEA agents. He recalled that the DEA agents called him a "son of a bitch" and "bastard," and that a DEA agent facing him displayed his hand across his neck in a cutting motion.

Defendant testified, with his voice cracking, that he was afraid of the DEA and of being brought United States face charges because he had read a book about the DEA's assassination of Pablo Escobar.

Defendant stated that the police did not specifically mention why he had been arrested. He was later told that there was in Interpol red notice filed against him seeking extradition. Defendant recalled how two agents violently forced him into a government vehicle before he was transported to the airport. While on the airplane, Defendant recalled being tied up while DEA agents took photographs of him. He reported that the DEA agents called him a "bastard," and told him he would "rot in jail" and that no one, not even God could save him. Following a one to two hour flight from Villavicencio, Colombia, Defendant arrived in Bogota, where ten to twelve DEA agents greeted his arrival. Colombian police officers transported Defendant, with his hands cuffed behind his back, in an armored truck to the police station. Once he arrived at the police station, two Colombian police officers grabbed him from the side and placed him in a chair in an interior-facing office with glass walls and a glass door. Defendant stated that he was left alone in the office while a Colombian police officer stood on the other side of the door. The Colombian police officer did not remain outside the door throughout the entire interrogation. Fifteen to twenty minutes later, six DEA agents walked into the office. Defendant stated that the DEA agents came into the room in an angry and animated manner. One DEA agent was nearly in tears, and stated that he wanted to hit Defendant because he was a friend of SA Watson. According to Defendant, the angry DEA agent then wrapped his hands around his throat, choking and taunting Defendant that he would "rot in hell." Defendant feared that he would die right there in the police station. Thereafter, other DEA agents angrily came into the room and told Defendant that they had the authority to kill him whenever they wanted.

Defendant acknowledged the DEA agents read him a statement of rights form, after which he requested an attorney. Defendant stated that the agents told him they "were not going to give him any more chances" and physically removed him from the office. Defendant stated that he was on his knees begging the police not to kill him, stating that he would cooperate with the investigation.

Defendant had a second interview with the DEA agents on June 27, 2013. The interview took place in a jail cell DIJIN. He acknowledged receiving the statement of rights form. Defendant stated that he did not read the form, but acknowledged that he initialed each paragraph and signed the bottom of the form. Defendant stated that he signed the form because he was afraid that the DEA agents would kill him if he did not comply with their wishes.

Defendant admitted that he later conducted two interviews with Colombian news media from the jail. Defendant acknowledged on cross-examination he did not tell the media that he was tortured or brutalized by DEA agents. Defendant stated that he spoke to the media by phone and therefore had no opportunity to show any bruises. He admitted that there are no photographs that evidence alleged brutalization at the hands of the DEA.

### IV. Analysis

#### A. Defendant's Custodial Statements

The Court denies Defendant's Motion to Suppress because the Government has demonstrated, by a preponderance of evidence, that Defendant's post-arrest statements were made voluntarily, after a knowing and intelligent waiver of his *Miranda* rights.

#### 1. Validity of Miranda Waiver

█ The validity of a waiver of *Miranda* rights depends on whether the

waiver was both voluntarily, and knowingly and intelligently made. The Government has the burden of proving the existence of both elements by a preponderance of the evidence. *United States v. Robinson,* 404 F.3d 850, 860 (4th Cir.2005). More specifically, the validity of a waiver depends on whether: (1) "relinquishment of the right ... [was] 'voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception;'" and (2) "'waiver ... [was] made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Cristobal,* 293 F.3d 134, 139–40 (4th Cir. 2002) (citing *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). Only if under the "totality of the circumstances" both distinct elements are shown to exist "may a court properly conclude that the *Miranda* rights have been waived." *Id.* at 140.

### a. *Voluntariness Element of Miranda Waiver*

■ The essential inquiry under *Miranda's* voluntariness requirement is "'whether the defendant's will has been 'overborne' or his capacity for self-determination critically impaired.'" *Cristobal,* 293 F.3d at 140 (citation omitted). In examining this element, the court "must consider ... the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.*

■ A statement will only be deemed involuntary if there is a showing of "coercive police activity." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *United*

States v. Braxton,* 112 F.3d 777, 780 (4th Cir.1997). Instead, the dispositive factor in a voluntariness inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Pelton,* 835 F.2d 1067, 1071–72 (4th Cir.1987) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)); *see also United States. v. Dodier,* 630 F.2d 232, 235–36 (4th Cir.1980) (evaluating the voluntariness of a confession based on whether it is the "product of an essentially free and unconstrained choice by its maker."). When evaluating voluntariness the court should look to "the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Hasan,* 747 F.Supp.2d 642, 658–59 (E.D.Va.2010) (quoting *United States v. Wertz,* 625 F.2d 1128, 1134 (4th Cir.1980)). The Supreme Court has noted the following factors are relevant in determining the voluntariness of a statement: the youth of the accused; a lack of education; low intelligence; lack of any advice to the accused of his constitutional rights; the length of detention; repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep. *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041. The Fourth Circuit in *Braxton* suggests that courts consider whether the suspect was deprived of anything, and whether the officers used deception. *Braxton,* 112 F.3d at 784–85.

■ Defendant contends that his statements were not voluntary because he was subject to "threats of violence, to include death, communicated orally as well as physically" when his statements were taken (Doc. 105). These threats, Defendant argues, "portrayed the subject violence as an imminent consequence of any refusal by

Defendant to incriminate himself. The threats overbore utterly his will." *Id.*

The facts and circumstances in this case establish that Defendant's statements were voluntary. The Court finds that SA Quintero's description of his interview with Defendant to be more credible that Defendant's version of events for several reasons.

First, the circumstances surrounding Defendant's arrest at his home and the swarm of Colombian and DEA agents who may have entered his home occurred several hours before his interview in Bogota, Columbia. The Government is not attempting offer any statement Defendant may have made in his home at the time of his arrest.

Second, the Court does not find it remarkable that multiple law enforcement officers would enter a home in the early morning hours and attempt to arrest an individual charged with murder. Police officers have to act in accord with their own judgment about the best way to affect an arrest insuring the safety of occupants of the home, and their own safety.

Third, Defendant's description of the room where the interrogation took place and the testimony of SA Quintero describing the physical characteristics of the room are the same. The interview was conducted in a room that had a desk, chair and windows looking into the interior of the police station where other Colombian national police officers could see the United States law enforcement agents interviewing Defendant. Defendant was delivered to the interview room by Colombian national police officers. While Defendant claims no Colombian police officer was at the door watching him as he was being interviewed, the Court infers that they were other police officers in the police station were able to see into the office while he was being interviewed. In other words, the Court does not have the impression that Defendant's interview was conducted in a secluded area where the police officers walking by in the office could not see what was going in the room.

Finally, Defendant made no mention of his alleged brutalization at the hands of the DEA to either the Colombian national police officers or to the Colombian media outlets despite having numerous opportunities to make such reports. DEA agents were not present during his news media interviews made by telephone from the jail. Defendant has no documentation of his alleged injuries, and Defendant made no mention of his alleged brutalization prior to the evidentiary hearing on October 6, 2014. Given the lack of corroboration of Defendant's statements, his unexplained delay in reporting his torture, his failure to disclose to the media that he was being tortured and unfairly prosecuted, the Court does not credit Defendant's testimony concerning his being attacked by the DEA agents or United States law enforcement agents during his interview on June 25, 2013. Accordingly, the Court finds that Defendant's statements at his interviews on June 25, 2013 and June 27, 2013 were voluntary and not subject to coercion.

b. *Knowing and Intelligent Element of Miranda Waiver*

■ To determine whether a defendant made a knowing and intelligent waiver of *Miranda* rights, the court must examine "'the suspect's intelligence and education, age and familiarity with the criminal justice system, [and] the proximity of the waiver to the giving of *Miranda* warnings.'" *Correll v. Thompson,* 63 F.3d 1279, 1288 (4th Cir.1995) (citation omitted).

■ The totality of the circumstances indicates that Defendant understood his *Miranda* rights and waived them. The

evidence indicates that before any questioning, Spanish speaking officers advised Defendant of his rights using a written form in Spanish. Defendant also reviewed the Spanish language form in the agents' presence. After those advisements, Defendant indicated, orally and in writing, that he wished to waive his *Miranda* rights and proceed with the interviews. These circumstances make clear that Defendant's *Miranda* waivers were knowing and intelligent. Accordingly, the Court holds that Defendant's Motion to suppress any custodial statements on June 25, 2013 and June 27, 2013 is **DENIED.** These statements, therefore, are admissible.

**B. Defendant's Non–Custodial Statements**

█ The Court denies Defendant's motion to exclude his voluntary statements made to Colombian media outlets because the Fifth Amendment and the exclusionary rule do not apply to non-governmental action or voluntary statements.

█ Defendant's argument that "but for the coercion that extracted his initial statement to American and Colombia law enforcement, none of Defendant's statements—to law enforcement or even subsequently to Colombian media—would have occurred" is meritless (Doc. 105). It is well-settled that the Fifth Amendment's Due Process Clause only applies to government actors. *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion."). Thus, the Fifth Amendment exclusionary rule, a judicially created remedy prohibiting illegally obtained evidence from being used by the government in the prosecution of a criminal case, is not applicable to evidence obtained through non-governmental action. *See Burdeau v. McDowell*, 256 U.S. 465, 41

S.Ct. 574, 65 L.Ed. 1048 (1921). Furthermore, the Fifth Amendment applies only to compelled statements. *See SEC v. Dunlap*, 253 F.3d 768, 775 (4th Cir.2001) (financial records of defendant's business not protected because voluntarily prepared).

Here, Defendant's statements to Colombian media outlets were not only voluntary, they were made to non-government actors. Therefore, the Fifth Amendment's exclusionary rule does not apply to Defendant's non-custodial statements to Colombian media outlets, and therefore, these statements will be admitted. Accordingly, Defendant's motion is **DENIED.**

**V. Conclusion**

The Court denies Defendant's Motion to Suppress because the Government has demonstrated, by a preponderance of evidence, that Defendant's post-arrest statements were made voluntarily, after a knowing and intelligent waiver of his *Miranda* rights. Additionally, Defendant's statements to Colombian media outlets were not only voluntary, they were made to non-government actors. Thus, the Fifth Amendment's exclusionary rule does not apply to Defendant's non-custodial statements to Colombian media outlets, and therefore, these statements are admissible.

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion to Suppress (Doc. 105) is **DENIED.**

**IT IS SO ORDERED.**