**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 13-4739**

───────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

   v.

ANTHONY WALKER,

        Defendant - Appellant.

───────────

Appeal from the United States District Court for the District of Maryland, at Baltimore.   James K. Bredar, District Judge. (1:12-cr-00579-JKB-1)

───────────

Argued: December 11, 2014        Decided: April 29, 2015

───────────

Before WILKINSON, GREGORY, and DUNCAN, Circuit Judges.

───────────

Affirmed by unpublished opinion.   Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge Duncan joined.

───────────

**ARGUED:** Julie L.B. Johnson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant.   Michael Clayton Hanlon, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant.   Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

───────────

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

The defendant-appellant, Anthony Walker, challenges the district court's denial of his pre-trial motions to suppress statements made and a firearm obtained after his arrest for drunk driving and the subsequent search of his vehicle. Because we find no clear error in the district court's rulings, we affirm.

I.

Walker was charged on November 1, 2012, in a one count indictment with possession of a firearm and ammunition under 18 U.S.C. § 922(g)(1). He pleaded not guilty, and later filed motions to suppress statements that he made during the course of his arrest, as well as tangible and derivative evidence.

On May 13, 2013, the district court held a hearing on Walker's motions to suppress. During the hearing, the government presented testimony from the two arresting officers, Officers Ryan Hill and Erin Masters, and their supervisor, Sergeant Kevin Toliver.

Officer Hill testified that he and Officer Masters were on patrol in a marked police car in the early hours of June 3, 2012. They were headed northbound on Division Street in West Baltimore, when they observed a white Mazda make a wide right turn into the southbound lane of Division Street. Both officers

2

identified Walker in court as the driver of the vehicle. According to Officer Hill, Walker "actually kind of came over into the right lane, my lane of traffic, and then came back over and sped -- went at a high rate of speed southbound on Division." J.A. 50;[1] see also J.A. 51 ("[T]he car was at least halfway over into my side of the street . . . ."); J.A. 121 (Officer Masters' testimony that "the right turn was very wide, and the vehicle got very close to our patrol car"). Officer Hill made a U-turn and began following Walker. As they were following Walker, Officer Hill observed Walker's vehicle slow down but fail to stop at two stop signs. J.A. 52-53 ("**Q.** So there was no complete stop? **A.** No. Not -- not close."); see also J.A. 121 (Officer Masters' testimony that the white Mazda "[f]ailed to stop at two stop signs"). Officer Hill thereafter activated the police cruiser's lights and siren and pulled Walker over. Walker parked his vehicle at an angle from the curb. The front of the vehicle was about four feet from the curb, and the rear of the vehicle was about twelve feet from the curb.

Officer Masters approached the passenger side of the car and Officer Hill approached the driver's side door. Officer

_____

[1] Citations to the J.A. refer to the parties' Joint Appendix filed in this case.

3

Hill asked Walker for his license and registration. Walker responded by presenting a "passenger-for-hire ID, not an actual driver's license." J.A. 63. Officer Hill testified that he twice handed the passenger-for-hire ID back to Walker, but Walker again presented the same ID. J.A. 66; J.A. 123 (Officer Masters' testimony that "[t]he Defendant was trying to hand him -- I didn't know at the time what it was, but later found out it was a sedan license, and Officer Hill said, 'No, I need your driver's license'").

Officer Hill stated that Walker's eyes were bloodshot and glassy and that he was not fully complying with instructions. Additionally, Officer Hill smelled an alcoholic odor on Walker and emanating from Walker's vehicle. Officer Masters testified that she also smelled alcohol on Walker's breath, but not until Walker was outside of the vehicle. Officer Hill additionally testified that Walker repeatedly leaned toward the center console of the vehicle, was pulling on the emergency brake and "he was just doing odd . . . hand motions towards the center of the car." J.A. 67-68.

Upon observing Walker's movements, and given also the odor of alcohol, Officer Hill asked Walker to exit his vehicle. Walker did not do so. Hill thus reached inside, turned off the ignition, and again requested that Walker step outside. Officer Hill stated that Walker instead leaned further toward the center

4

of the car and put his hands down.  Officer Hill then "grabbed [Walker's] arm and pulled him out of the car."  J.A. 69; see also J.A. 125 (Officer Masters' testimony that, "initially, [Officer Hill] asked the Defendant to exit the vehicle.  When he did that, I observed the Defendant lean towards the center console.  He did not comply.  Officer Hill then removed the Defendant from the vehicle").

As the officers accompanied Walker to the rear of his car, he stumbled at least one time.  Officer Hill inquired whether Walker had consumed any alcohol.  Walker first denied drinking anything, but when asked again, he admitted to having a beer and a vodka.  Officers Hill and Masters handcuffed and arrested Walker once he reached the back of his car.  Officer Hill did not recall whether he formally advised Walker that he was under arrest at that time, but Officer Masters recalled that Officer Hill did so.  Officer Hill did not conduct any field sobriety tests because he is "not certified through the State of Maryland to give a field sobriety test."[2]  J.A. 73.  He also testified

---

[2] Officer Hill testified that he was "in the U.S. Coast Guard as a boarding officer" and that, while he "was field sobriety test trained" through the Coast Guard, "that doesn't make [him] certified to do it in Maryland."  J.A. 74.  In his capacity as a United States Coast Guard boarding officer, his "dut[ies] include[d] observing people and making judgments about whether or not a person is intoxicated or under the influence while operating a seacraft."  J.A. 74.  He was trained "to
(Continued)

5

that because it was a weekend night, it was unlikely that other law enforcement officials could come to the scene to conduct the tests. He noted, however, that he "received training in the Police Academy for observations for impaired drivers." J.A. 74.

Officer Masters remained at the rear of the vehicle with Walker, while Officer Hill returned to the driver's side door of Walker's car. Officer Hill testified that he was compelled to check the car because Walker's actions immediately prior to being removed from the car suggested that he was attempting to conceal evidence. He stated that he thought he would find "some kind of alcohol or -- my biggest thing, I figured it was some kind of a controlled dangerous substance." J.A. 76. Instead of alcohol or a controlled substance, Officer Hill discovered a firearm when he opened the center console. He stated that the firearm was next to a bag of rubber gloves with the pistol grip facing upward and the barrel facing down into the console. He also saw a cell phone and a dollar bill under the driver's seat. At some point, Officer Hill also located both Walker's Maryland driver's license, as well as his vehicle registration.

Officer Hill testified that the car had to be towed. Thus, even if he had not expected to find any evidence in the car, he

---

observe . . . gait, the ability to stand up, speech, being talkative, having mussed-up clothing," and the like. J.A. 74.

6

would still have entered the vehicle to retrieve the registration. Moreover, he stated that the Baltimore Police Department's procedures require officers to "fill out a towed vehicle report that gives all the information of the vehicle, why it's being towed, and then you do an inventory of the car before towing the vehicle." J.A. 77; see also J.A. 35-43 (Baltimore Police Department General Order I-2: Towing Procedures).[3] The search would have encompassed the passenger compartment, including the center console.

Upon discovering the firearm, Officer Hill signaled to Office Masters that he had found a gun. After removing the gun

---

[3] The policy statement in the Towing Procedures provides: "It is the policy of the Baltimore Police Department to request medallion towing services for civilian vehicles that have been involved in traffic incidents and are creating a traffic hazard, are found to be stolen or are being held for evidence." J.A. 35. Prior to towing a car that must be moved due to an accident, disability, and/or emergency, officers must "[r]emove and inventory all property of value left in the trunk and the interior of the car." J.A. 36; see also J.A. 37 ("Itemize all property, removed from the vehicle, on the Vehicle Report and process according to departmental procedure."); J.A. 40 (providing that when a vehicle must be towed due to the arrest of the owner/operator, officers should "have the vehicle towed to the City Yard in keeping with procedures for 'Vehicles Disabled As A Result Of an Accident, Disability, and/or Emergency' section of this Order"). The Towing Procedures further state that "[a]n inventory is not conducted for the purpose of searching for contraband, but to secure the contents of the vehicle and to protect the officer against civil suits arising from claims of loss or damage. Remove any property of value from the interior of the car. When looking for evidence of a crime, get a warrant." J.A. 36.

7

from Walker's car and unloading it, Officer Hill advised Walker of his <u>Miranda</u> rights. He did so from memory, and recited his standard warning during the suppression hearing as follows:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law . . . . You have the right to an attorney. If you cannot afford an attorney, one will be appointed to you. At any point during questioning, you can feel free to stop answering questions. At any point during questioning, you can feel free to request a lawyer.

J.A. 81. He stated that he normally then asks if the arrestee understands the rights. In this case, Walker indicated that he understood his rights. Officer Hill then asked Walker if he nonetheless would like to answer some questions, and Walker said that he would. Officer Hill acknowledged that he did not recall the exact words Walker used in stating that he understood his rights and was still willing to answer questions, but he was certain that Walker had verbally affirmed his understanding. Walker did not request a lawyer.

Walker initially denied any knowledge of the gun. Officer Hill thus asked his supervisor, Sergeant Toliver, to come to the scene to speak with Walker, and Walker eventually stated to Sergeant Toliver that he found the gun in an alley. Sergeant Toliver testified that he asked Walker, "If you found it, why didn't you call the police instead of picking it up and driving around with it?" J.A. 137. Walker allegedly replied, "Why would I call the police?" J.A. 137. Sergeant Toliver testified

8

that, "[a]t that time, [Walker] didn't appear to be in a stable frame of mind," and he thus advised Officers Hill and Masters that he would take Walker to the station. J.A. 137. He stated that, "on the ride to the station, [Walker] was just talking and babbling." J.A. 137; see also J.A. 141-42 (describing Walker's speech as "hyper" and "fast" and "all over the place"). Sergeant Toliver testified that he did not ask Walker any more questions, but that, throughout the ride to the station, Walker "kept making up or saying different stories of how he got in possession of the handgun." J.A. 139; J.A. 141. Walker did not request an attorney or invoke his right to remain silent while he was with Sergeant Toliver.

Later, at the station, Officer Hill filled out paperwork, including citations for failure to stop at two stop signs and driving while under the influence, as well as an "advice of rights" form that Baltimore police officers must provide prior to administering a breathalyzer. J.A. 84-86. The citations did not include any information about Walker reaching toward the center console of the vehicle, or about why Officer Hill ordered Walker to exit his vehicle. Officer Hill stated that he failed to include the "furtive gestures" in his report because "[t]hat wasn't part of [his] probable cause for arresting [Walker]." J.A. 94. Additionally, Officer Hill's reports failed to state that he was not qualified in the State of Maryland to conduct

9

field sobriety tests; rather, they stated only that Walker was unable to perform the tests. Finally, the towed vehicle report, which Officer Masters completed, failed to record the dollar bill and the cell phone that Officer Hill discovered when he searched Walker's car. Officer Hill stated that he forgot to tell Officer Masters about the two items in the excitement surrounding the discovery of the gun. According to Officer Hill, Walker refused to take a breathalyzer or to sign any of the paperwork.

On cross examination, Officer Hill testified that he had conducted four or five DUI traffic stops prior to stopping Walker, and Officer Masters testified that she had conducted two or three DUI stops. Officer Hill stated that on each prior occasion, the drivers were arrested, and the vehicles were subsequently searched because the officers "have to go into the car either way . . . before we tow it, . . . we always go through the car once . . . ." J.A. 113. He further stated that he "always tow[s] the car on DUIs . . . ." J.A. 113.

Before the district court, Walker argued that the statements he made both before and after his arrest were obtained in violation of his Fifth and Sixth Amendment rights, were involuntary, and were the fruit of his illegal arrest. He additionally argued that even if his arrest was lawful, the

10

search of his car was a violation of his Fourth Amendment rights under Arizona v. Gant, 556 U.S. 332 (2009).

The district court judge denied both of Walker's motions to suppress from the bench. First, the district judge found that there was probable cause to arrest Walker based on: his erratic driving; failure to stop at two stop signs; strong odor of alcohol; failure to comply with requests made by Officer Hill for his license; furtive gestures toward the center of the car "consistent, in the officer's experience, with someone who is trying to conceal or hide something or dispose of something"; failure to exit the vehicle when asked; and stumbling or staggering when walking to the rear of his vehicle. J.A. 155-56. The court further concluded that Officer Hill had probable cause to reenter Walker's vehicle based on the "ample evidence . . . that the Defendant was operating that vehicle while he was impaired by some substance." J.A. 157 (highlighting the "odd movements" Walker was making with his hands and the "suspicion on the officer's part that the Defendant was trying to conceal something"). The district judge found alternatively that, "given how that car was parked on that road with that defendant now lawfully having been arrested, that car had to be moved out of Division Street." J.A. 158. Accordingly, the court found that it was appropriate for the officers to have the car towed. J.A. 157-58. Specifically, even if Officer Hill had not

11

conducted the search at issue, he or another officer would have conducted an inventory search prior to towing, and discovery of the firearm was thus inevitable.

As to Walker's motions to suppress his statements, the court found that the preliminary statements made by Walker were responses to appropriate preliminary questions that may be asked without a <u>Miranda</u> advisement. Moreover, Officer Hill's verbal <u>Miranda</u> advisement complied with the requirements of <u>Miranda</u>. Finally, the district court found that, based on the testimony offered, "the Defendant was not falling down, incoherently drunk, but, at the same time, was sufficiently impaired that it was . . . unlawful for him to operate a motor vehicle." J.A. 161. The court continued:

> I don't find that from the evidence presented at this hearing that the Defendant was so inebriated that he really had no meaningful understanding of what he was being told or what he was being asked, and . . . he had enough residual competency, despite his impairment, to understand the advisement that he received and to knowingly and intelligently waive his <u>Miranda</u> warnings and participate in the conversations that he participated in with the police officers.

J.A. 161.

Walker was tried by a jury from May 28-30, 2013 on one count of violating 18 U.S.C. § 922(g)(1). On May 30, 2013, the jury found him guilty, and he was later sentenced to 72 months' imprisonment, to be followed by 3 years of supervised release. This appeal followed.

12

II.

We review the district court's factual findings underlying a motion to suppress for clear error, and the court's legal determinations de novo. See United States v. Wilson, 484 F.3d 267, 280 (4th Cir. 2007) (citing Ornealas v. United States, 517 U.S. 690, 699 (1996)). When a suppression motion has been denied, we review the evidence in the light most favorable to the government. See United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998).

Walker advances four arguments. He argues first that there was no probable cause for his arrest; second, that the firearm should have been suppressed as the fruit of the unlawful arrest; third, that he was so intoxicated that any waiver of his Miranda rights was involuntary, unknowing, and unintelligent; and finally, that his statements should have been suppressed as a result of the unlawful arrest and search.[4] We address each argument in turn.

A.

Walker contends that Officer Hill's stated reasons for probable cause were "ambiguous" and did not create probable cause for the arrest. Probable cause for arrest exists when

_____

[4] Walker does not challenge the statements that he made prior to his arrest.

13

"facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998) (citing Brinegar v. United States, 338 U.S. 160, 175 (1949)). "It is an objective standard of probability that reasonable and prudent persons apply in everyday life." Id. Moreover, because probable cause is an "objective" test, we thus "examine the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; we do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause." Id.; see also Whren v. United States, 517 U.S. 806, 813 (1996) (reiterating that "subjective intent alone does not make otherwise lawful conduct illegal or unconstitutional" (internal alteration and ellipsis omitted)).

Walker argues that Officer Hill's testimony that he smelled a "strong odor" of alcohol emanating from Walker and his vehicle is contradicted by Officer Masters' testimony that she only

14

smelled alcohol on Walker's breath once he was outside of the car. He also takes issue with the fact that Officer Masters did not testify, as Officer Hill did, that Walker's eyes were bloodshot or glassy, despite spending more time in close proximity with him than Officer Hill. These differences are not enough to call the district court's factual findings into question, especially given the consistency between the two officers' stories, as well as the defendant's own admissions. First, both officers smelled alcohol on Walker's breath. Second, both testified that Walker stumbled at least once on his walk to the rear of the vehicle. Third, it is undisputed that Walker was driving erratically: he made a very wide right turn such that his vehicle crossed into the opposing lane of traffic, and then proceeded at a high rate of speed through two stop signs without coming to a complete stop. Finally, the defendant admitted to consuming two alcoholic beverages. Thus, regardless of the alleged inconsistency in their testimony, the two officers indeed had probable cause "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." DeFillippo, 443 U.S. at 37.

Walker argues next that upon observing his apparent impairment, the appropriate course of conduct would have been

for the officers to conduct field sobriety tests. However, he cites no legal authority for this argument. Indeed, other circuits (albeit in unpublished opinions) have found that there existed probable cause to arrest in cases where police had not conducted field sobriety tests prior to arrest. See Ankele v. Hambrick, 136 F. App'x 551, 552-53 (3d Cir. 2005) (finding probable cause to arrest for driving under the influence where officer observed defendant walked with "staggered gait," had bloodshot eyes, had alcohol on his breath, and admitted that he had been drinking alcohol); Otero v. Town of Southampton, 194 F. Supp. 2d 167, 172, 178 (E.D.N.Y. 2002), aff'd, 59 F. App'x 409 (2d Cir. 2003) (finding probable cause to arrest for driving while intoxicated where police officer observed bus driver cross double yellow line, make a wide turn into oncoming lane of traffic, and fall to the ground when exiting his bus). Performance on field sobriety tests, while undoubtedly helpful, is but one factor among many that might serve as a proper foundation for probable cause for an officer to arrest a driver on suspicion of driving under the influence. See, e.g., 1 Donald H. Nichols & Flem K. Whited III, Drinking/Driving Litigation § 5:5 (2d ed. 2006) ("Following a stop the officer will be looking for additional information to establish probable cause for arrest. Information an officer may use to establish probable cause includes an erratic driving pattern or a driving

16

offense accompanied by various symptoms of intoxication.  Poor performance on the field sobriety test, an odor of alcohol on the breath, unsteadiness, a flushed face, and bloodshot eyes are factors that following a stop constitute adequate grounds for arrest."  (footnotes omitted)).  Even if, as Walker argues, "Officer Hill was simply not interested in establishing how Mr. Walker would perform on those tests," Appellant's Br. 13, Officer Hill's subjective intent is immaterial in light of the ample indicia of intoxication.  The district court did not clearly err in finding that a reasonably prudent person could assume from Walker's actions that he was driving while under the influence of alcohol, and that there was thus probable cause for his arrest.

B.

Walker next contends that the district court erred when it denied his motion to suppress the firearm as the fruit of an unlawful arrest.[5]  However, as discussed above, there was

---

[5] Although Walker's motion before the district court also challenged the search of his car under Arizona v. Gant, 556 U.S. 322 (2009), J.A. 15, he has not advanced that argument on appeal.  We thus deem the issue waived and do not reach the district court's rulings concerning Gant.  Schlossberg v. Barney, 308 F.3d 174, 182 n.6 (4th Cir. 2004).  Even if Walker had not waived his Gant argument, there would be no need to decide whether a Fourth Amendment violation had occurred.  Rather, we are persuaded by the district court's analysis concluding that, because Walker's vehicle was blocking traffic and had to be towed, it was inevitable that police would have (Continued)

17

probable cause for Walker's arrest.  Accordingly, we reject his argument that the search was the fruit of an unlawful arrest.

C.

Walker also argues that, even if there was probable cause for his arrest, his statements must be suppressed because he was too intoxicated to waive his <u>Miranda</u> rights.  In making his arguments, Walker concedes that "[a]t the suppression hearing, the government presented uncontested evidence that Officer Hill recited from memory a <u>Miranda</u> warning to Mr. Walker after he was placed under arrest."  Appellant's Br. 23.  He does not challenge the sufficiency of the <u>Miranda</u> warning, but focuses instead on the effectiveness of his waiver.

"<u>Miranda</u> held that once given the now familiar warnings of his rights under the fifth and sixth amendments, a suspect could 'waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.'"  <u>United States v. Smith</u>, 608 F.2d 1011, 1012 (4th Cir. 1979) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)).  The Supreme Court has reiterated that while requiring <u>Miranda</u> warnings "does not, of course, dispense with the voluntariness inquiry[,] . . . '[c]ases in which a defendant can make a colorable argument that

---

discovered the firearm while conducting an inventory search pursuant to Baltimore Police Department procedure.

18

a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'" Dickerson v. United States, 530 U.S. 428, 444 (2000) (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n.20) (internal citation omitted).

As we have previously observed, our "inquiry into whether an individual waived effectuation of the rights conveyed in the Miranda warnings has two distinct dimensions." United States v. Cristobal, 293 F.3d 134, 139 (4th Cir. 2002) (citing Edwards v. Arizona, 451 U.S. 477, 482 (1981)). "First, the relinquishment of the right 'must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.'" Id. at 139 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Second, in addition to being voluntary, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. at 140. We determine whether a Miranda waiver is voluntary, knowing, and intelligent by examining the totality of the circumstances. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran, 475 U.S. at 421.

19

i.

The voluntariness of a waiver depends on "the absence of police overreaching, not on 'free choice' in any broader sense of the word." Colorado v. Connelly, 479 U.S. 157, 170 (1986). A defendant's "incriminating statement is deemed involuntary only if induced by such duress or coercion that the suspect's 'will has been overborne and his capacity for self-determination critically impaired.'" United States v. Locklear, 829 F.2d 1314, 1317 (4th Cir. 1987). "To determine whether a defendant's will has been overborne or his capacity for self determination critically impaired, courts must consider the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Cristobal, 293 F.3d at 140 (quoting United States v. Pelton, 835 F.2d 1067, 1072 (4th Cir. 1987)). As relevant to this case, we have held that consumption of pain killers and narcotics are alone insufficient to render a waiver involuntary. Id. at 141. Rather, the focus of the voluntariness determination remains "whether one's will has been overborne." Id. ("[A] deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary." (citing Connelly, 479 U.S. at 164-65)). Similarly, other

20

circuits have held that intoxication does "not automatically render a confession involuntary; rather, the test is whether [this] mental impairment[] caused the defendant's will to be overborne." United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1900); see also United States v. Montgomery, 621 F.3d 568, 574 (6th Cir. 2010) (citing Casal); United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993). "The Government has the burden of proving, by a preponderance of the evidence, that the defendant's waiver of his Miranda rights was knowing and voluntary." United States v. Robinson, 404 F.3d 850, 859 (4th Cir. 2005).

Here, Walker has presented no evidence that Officers Hill or Masters engaged in any "intimidation, coercion, or deception." Burbine, 475 U.S. at 421. Rather, the uncontested evidence before the district court showed that Officer Hill advised Walker of his Miranda rights, and that Walker thereafter consented to answer questions. The interview took place on the side of the road, and comprised questions about what the officers found in Walker's car, as well as whether he had been drinking. Although Walker was placed in handcuffs, there are no allegations that any officers deceived Walker or elicited statements from him in a coercive manner. Moreover, there is no evidence in the record that the officers sought to exploit Walker's intoxication in order to unlawfully obtain

21

incriminating statements from him. See Cristobal, 293 F.3d at 141 (finding waiver voluntary where evidence did "not show that law enforcement officials exploited Cristobal's weakened condition with coercive tactics," where he did not request not to be interviewed, and where "[n]o officer harmed or threatened to harm Cristobal if he did not waive his rights and answer . . . questions"). On reviewing the record in this case, we find that Walker's waiver was voluntary.

## ii.

We next determine whether the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Cristobal, 293 F.3d at 140. Put differently, we must consider whether the waiver was made knowingly and intelligently. Id. "Unlike the issue of voluntariness, police overreaching (coercion) is not a prerequisite for finding that a waiver was not knowing and intelligently made." Id. at 142. We must consider, however, whether Walker's intoxication was such that it impaired his ability to give a knowing and intelligent waiver of his Miranda rights. Id. ("Because we find no coercive police activity (and thus the waiver was voluntary), it is in our inquiry into whether Cristobal's waiver was knowing and intelligent that his mental condition due to the pain killers and narcotics is the

22

most relevant."). As with voluntariness, we consider the totality of the circumstances. Id.

"The test of whether a person is too affected by alcohol or other drugs voluntarily and intelligently to waive his rights is one of coherence, of an understanding of what is happening." United States v. Smith, 608 F.2d 1011, 1012 (4th Cir. 1979); see also id. at 1012-13 (finding district court did not clearly err in concluding that Miranda waiver was valid where defendant testified that he had "drunk enormous quantities of alcohol in the twenty-four hour period before the interview" with police, because district court found that "while Smith appeared to be drinking . . . he was sober enough to know where he was and to recognize who the people around him were" (internal quotation marks omitted)). In Cristobal, we explicitly declined to "stat[e] that whenever a defendant can show that he was given medication, his Miranda waiver was per se ineffective." 293 F.3d at 142. While medication is certainly different from alcohol in some respects, we see no reason to announce a per se rule that intoxication, without more, is sufficient to render a Miranda waiver ineffective. "Other circuits, in likewise upholding Miranda waivers, have done so despite drug impairment." Montgomery, 621 F.3d at 572-73 (citing Cristobal, and cases from the Seventh, Eighth and Tenth Circuits); United States v. Burson, 531 F.3d 1254, 1258 (10th Cir. 2008) (holding

23

that "[t]he mere fact of drug or alcohol use will not suffice" to show that a defendant's Miranda waiver is ineffective, but rather the defendant "must produce evidence showing that his condition was such that it rose to the level of substantial impairment").

The totality of the circumstances here does not suggest that the district court's factual findings were clearly erroneous. The court credited Officer Hill's indication in his report that Walker's intoxication was "obvious, but not extreme." J.A. 161. The court found that Walker's driving was erratic, and that he had at least some trouble walking. The district court additionally acknowledged Sergeant Toliver's observations "that some of [Walker's] answers to the questions were a little – suggested that the guy was a little bit out of it." J.A. 161. However, the court did not "find from the evidence presented . . . that the Defendant was so inebriated that he really had no meaningful understanding of what he was being told or what he was being asked." Id.

To be sure, and as just described, there is evidence in the record of the effects of alcohol consumption on Walker. But viewing the evidence in the light most favorable to the government, Seidman, 156 F.3d at 547, the district court did not clearly err in finding that those effects were not substantial enough to render Walker's Miranda waiver unknowing or

24

unintelligent. Walker's own words and actions suggested that he was aware of the import of the traffic stop, arrest, and the Miranda warning. He pulled his car over immediately when Officer Hill turned on the police cruiser's lights. He first denied consuming alcohol, and then admitted to having two drinks. He initially denied knowledge of the firearm, and then later made several inconsistent statements about how he had obtained the gun. Though Walker answered some questions, he affirmatively refused to sign any paperwork or to take a breathalyzer at the police station. Although Sergeant Toliver characterized Walker's speech as "hyper" and "fast," J.A. 141, Walker's responses and actions were more in line with an individual attempting to avoid detection than one who was unaware of what he was doing or saying. Cf. United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 1987) ("An accused's decision to answer some questions, but not others, further supports a finding of an implied waiver -- the accused's selective responses suggest an understanding of the right not to respond."). Importantly, in addition to what can be gleaned from Walker's actions and words, Officer Hill's testimony, which the district court credited, was that Walker was not so intoxicated that he was not aware of his rights or did not understand them.

25

We thus conclude that the district court did not clearly err in finding that Walker's <u>Miranda</u> waiver was knowing and intelligent. Because Walker does not otherwise challenge the <u>Miranda</u> warning that he received, we find that the district court did not err in denying his motion to suppress his statements.

D.

Finally, Walker argues that his post-arrest statements should have been suppressed as fruit of an unlawful arrest and search, even assuming that the <u>Miranda</u> warning was properly given, understood, and waived. In so arguing, Walker predicates his argument that the search of his vehicle was unlawful on the assumption that his arrest was unlawful. But as we concluded above, there was probable cause for Walker's arrest. The district court thus did not err in denying Walker's motion to suppress the statements at issue.

Moreover, even if the district court did err in refusing to suppress Walker's statements, we would review the admission of the statements at trial for harmless error beyond a reasonable doubt. <u>United States v. Mobley</u>, 40 F.3d 688, 693 (4th Cir. 1994). At trial, Walker did not dispute Officer Hill's testimony that the barrel of the gun was facing down into the center console, and the pistol grip was facing upward. Nor did he dispute that the firearm was loaded. And, importantly, the

26

car that Walker was driving was registered in his name. Given the positioning and easily reachable location of the gun, the fact that Walker was the only individual in the vehicle at the time of the arrest, and the fact that Walker was driving his own vehicle at the time of the arrest, the admission of the statements at issue was harmless error. The government provided sufficient evidence aside from the statements "to establish constructive possession under § 922(g)(1)" because a reasonable jury could find beyond a reasonable doubt that he "intentionally exercised dominion and control over the firearm, or had the power and the intention to exercise dominion and control over the firearm." United States v. Scott, 424 F.3d 431, 435-36 (4th Cir. 2005) (affirming conviction on the basis of constructive possession of a firearm in violation of § 922(g)(1) where a passenger in the defendant's car was carrying a gun and the defendant advised the passengers that he refused to continue driving if the gun was not removed); see also United States v. Branch, 537 F.3d 328, 343 (4th Cir. 2008) ("As we have held, '[a] person has constructive possession over contraband when he has ownership, dominion, or control over the contraband itself or over the premises or vehicle in which it [is] concealed.'" (quoting United States v. Singleton, 441 F.3d 290, 296 (4th Cir. 2006)). Accordingly, even if it was error to allow Walker's post-arrest statements concerning the firearm, such error was

27

harmless.  See Mobley, 40 F.3d at 694 (finding that it was harmless error to admit defendant's statement about presence of weapon in his apartment at trial where evidence showed that defendant "was the sole occupant of the apartment," the apartment was leased in his name, and the gun was located among the defendant's clothing).

### III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.